[Civ. No. 8032. Second Appellate District, Division One.—October 31, 1934.]

GOODYEAR TIRE & RUBBER COMPANY OF CALIFORNIA (a Corporation), Respondent, v. WELLS FARGO BANK AND UNION TRUST COMPANY (a Corporation), Appellant.

GOODYEAR TIRE & RUBBER COMPANY OF CALIFORNIA (a Corporation), Respondent, v. WELLS FARGO BANK AND UNION TRUST COMPANY (a Corporation) et al., Appellants.

GOODYEAR TIRE & RUBBER COMPANY OF CALIFORNIA (a Corporation), Respondent, v. SECURITY TRUST & SAVINGS BANK (a Corporation), Appellant.

GOODYEAR TIRE & RUBBER COMPANY OF CALIFORNIA (a Corporation), Respondent, v. SECURITY-FIRST NATIONAL BANK OF LOS ANGELES (a National Banking Association), Appellant.

John M. Hall, Flint & MacKay, William A. Bowen, Edward L. Compton, Jennings & Belcher and Frank B. Belcher for Appellants.

O'Melveny, Tuller & Myers, Homer I. Mitchell, Charles X. Arnold, Walter K. Tuller and John L. Rush for Respondents.

ROTH, J., *pro tem.*—These appeals are, by stipulation, brought before us on a single bill of exceptions. They embrace five separate actions which were in the court below, by stipulation, consolidated for the purpose of trial.

Although there are two several plaintiffs and four several defendants, the facts and the issues raised, with certain exceptions hereinafter specifically noted, are such that the cases may be treated as if there were but one action. The several and collective actions will therefore, except when otherwise necessary, be referred to in the singular, such designation, for the purposes of this decision, including all five actions.

Respondent sued appellant for an alleged balance due on its bank account. Appellant answered there was no balance due.

The controversy arises out of the following facts, most of which were included in a stipulation of the parties and such as were not included appearing without conflict in the evidence.

In 1919 respondent transferred one Downs, who was then and who had been theretofore for some time employed by

it in Akron, Ohio, to California. From 1919 to 1926 he was manager of the accounting department and also held the offices of cashier, treasurer and comptroller. In the conduct of its business, respondent frequently became obligated to its customers, of which it had approximately 20,000 on its books, for credit balances in favor of the latter which might arise from goods returned, claims for replacements, discounts and in other ways. Upon determination of a credit balance respondent would draw a check to the customer and thus discharge the same. All records involving these credit balances were kept directly under Downs' supervision and control and it was also a part of his duties to attend to the payment and discharge of the same. Under arrangement existing between respondent and appellant during this entire period of time, two signatures were required on all checks drawn by respondent. One of the signatures authorized was that of Downs.

Abusing the confidence of his employer, Downs, over a period of years, specifically from 1921 to 1926, created on the books of respondent fictitious accounts and by various means caused fictitious credit balances to be set up on the books to these fictitious accounts. Thereafter, Downs prepared or caused to be prepared checks to discharge these fictitious obligations. All checks so drawn, of which there are seventy here involved (with the exception of one), were signed by Downs and some other cosigner. The one exception will be separately treated.

Pursuant to the system employed by respondent, Downs or a clerk working under his supervision would make the routine memoranda, requisitions, ledger cards, sales ledger and journal slips and do any other things required by the bookkeeping routine as conditions precedent to the drawing of a check. The check would then be typed and presented with the necessary supporting documents, all of which when prepared appeared to be regular on their face, to the cosigners of Downs. The cosigners, in reliance upon the system used by respondent and being satisfied that the supporting documents were in order, would sign the checks. When the checks were presented to Downs' cosigners supporting documents were not always presented. In some instances Downs had already signed and the cosigners added their signatures on the strength of the signature of Downs.

While it appears that with reference to many of the checks involved Downs was the last man who signed the check, it is not clear how many checks were last signed by Downs. When the checks were completed Downs stole the same, indorsed the names of the fictitious payees and obtained the cash. The checks involved totaled in excess of $100,000, are regular on their face and it is admitted that they were all signed by persons thereunto duly authorized to make signature. Most of the checks were cashed by Downs through one Pete Merich, who deposited the same for collection with one of three banks, and thereafter, through the Clearing House, these checks were presented to and paid by appellant. Appellant made payment upon the faith of the guarantee of the prior indorser, making no investigation to determine whether the signature of the original payee was genuine. In some instances Downs indorsed several of the checks below the indorsement of the non-existing payee, presenting such checks personally to appellant and receiving the cash.

During this entire period, pursuant to arrangement made at the time respondent opened its account, appellant rendered monthly statements and as a part thereof returned all canceled checks to respondent. Each statement so rendered contained a notice substantially to the effect that, unless an error was reported within ten days, the account and the vouchers would be deemed correct. It was stipulated in this case that respondent made no complaint and pointed out no error until some time in March, 1926. The evidence also discloses that respondent had an annual audit made by a firm of certified public accountants and that during this period of time it issued regularly between 3,000 and 5,000 checks per month or between 180,000 and 300,000 during the period of time involved. In making the annual audit, the accounting firm picked out test transactions at random and tested such random selections from beginning to end. In February, 1926, in the process of one of these annual audits, the perfidy of Downs was discovered. A complete report by the auditors followed on March 15, 1926, whereupon demand was made upon appellant for the amount involved.

▪ Respondent asserts that all of said checks were paid on forged indorsements and that the appellant, therefore,

wrongfully charged these checks to its account and owes to it a balance in the amount of the total of said checks. The trial court agreed with this contention, rendered judgment accordingly, and from that judgment appellant brings this appeal. Respondent's case is predicated entirely upon the duty of appellant bank with reference to the payment of checks as stated in *Los Angeles Inv. Co.* v. *Home Sav. Bank,* 180 Cal. 601, at page 604 [182 Pac. 293, 5 A. L. R. 1193], as follows:

"The general rule must be conceded that the undertaking of a bank is to pay out the depositor's money only on the order of the depositor and in accordance with that order. If it pays out money on a check drawn to order, as were the checks in this case, upon a forged endorsement of the payee's name, it has not paid in accordance with the depositor's order, and in the absence of anything further, has no right to charge such payment against the depositor's account." (*Hatton* v. *Holmes,* 97 Cal. 208 [31 Pac. 1131]; *Union Tool Co.* v. *Farmers etc. Bank,* 192 Cal. 40 [218 Pac. 424, 28 A. L. R. 1417]; *Jordan Marsh Co.* v. *National Shawmut Bank,* 201 Mass. 397 [87 N. E. 740, 22 L. R. A. (N. S.) 250]; *Shipman* v. *Bank,* 126 N. Y. 318 [27 N. E. 371, 22 Am. St. Rep. 821, 12 L. R. A. 791]; *Leather Manufacturers Nat. Bank* v. *Merchants Nat. Bank,* 128 U. S. 26, 34 [9 Sup. Ct. 3, 32 L. Ed. 342].) Appellant's principal contention, and the one which is decisive of the case at bar is that the checks having been drawn to nonexisting persons were payable to bearer within the meaning of subdivision 3 of section 3090 of the Civil Code, and that no indorsement was necessary. Appellant asserts that as no indorsement was necessary there could be no forgery. If this be true, appellant cannot be held liable.

■ It becomes important, therefore, to determine when a check is a "bearer" check. The applicable statutory provision is subdivision 3 of section 3090 of the Civil Code, which reads as follows: "3090. Payable to Bearer. The instrument is payable to bearer, . . . (3) when it is payable to the order of a fictitious or nonexisting person, and such fact was known to the person making it so payable; . . ."

The case of *Seaboard Nat. Bank* v. *Bank of America,* 193 N. Y. 26 [85 N. E. 829, 22 L. R. A. (N. S.) 499], recognized

as a leading case on this subject, lays down the rule that the intention to make the instrument payable to a fictitious person "must exist as an affirmative fact in the mind of the drawer of a draft at the time of its delivery". In the construction of this particular language it has been recognized that "fictitious or nonexisting persons" literally construed is not sufficiently embracive to cover all situations in which the instrument is "bearer" paper within the meaning of said language. Thus it has been definitely established and the rule has been consistently followed that a check drawn to a payee who may be an actual existing person but who is not intended to have any interest therein is "bearer" paper. The classical construction of this language is made in *Bank of England* v. *Vagliano*, L. R. App. Cas. (1891) 107 : " . . . where, the payee named is so named by way of pretense only without the intention that he shall be the person to receive payment, is it doing violence to the language to say that the payee is a fictitious person? I think not. I do not think that the word 'fictitious' is exclusively used to qualify that which has no real existence." The phrase "fictitious or nonexisting person" is subject to other ambiguities, some of which are not covered by the literal language and which obviously must be embraced therein, and others of which are covered by the literal language and which obviously must be excluded ("The Fictitious Payee", 18 Mich. L. R. 296), but these other ambiguities are not important here. For our purpose it is sufficient to adopt the language of the court in *Norton et al.* v. *City Bank & Trust Co.*, 294 Fed. 839, 844, wherein it is said: "Nevertheless the law is now well settled that a negotiable instrument is drawn to a fictitious payee whenever the payee named in it has no right to it, and its maker does not intend that such payee shall take anything by it." And the court in the case of *Snyder* v. *Corn Exchange Nat. Bank*, 221 Pa. 599, 606 [70 Atl. 876, 128 Am. St. Rep. 780], says: "The intent of the drawer of the check, in inserting the name of a payee, is the sole test of whether the payee is a fictitious person, . . . It is clear that when the legislature declared that a check payable to a 'fictitious or nonexisting person' is to be regarded as payable to bearer, it meant a fictitious person to be one who, though named as payee in a check, has no right to it, or to the proceeds of it, because the drawer of it so intended; and it, therefore,

matters not whether the name of the payee used by him be that of one living or dead, or one who never existed.'' (*Phillips* v. *Mercantile Nat. Bank,* 140 N. Y. 556 [35 N. E. 982, 37 Am. St. Rep. 596, 23 L. R. A. 584]; *Bartlett* v. *First Nat. Bank,* 247 Ill. 490 [93 N. E. 337]; *Coggill* v. *American Exchange Bank,* 1 N. Y. 113 [49 Am. Dec. 310].) It is clear from the foregoing that a fictitious person can be anyone named in a check irrespective of the actual, fictitious or non-existing character of such payee if it be intended by the ''person making it so payable'' to the payee that such payee should have no interest in the check.

The next question which must be determined is what is meant by the language in the statute '' . . . such fact was known to the person making the check so payable''. This question has also been decided by the cases. The authorities establish the proposition that the ''drawer'' or ''maker'' of a check and ''the person making it so payable'' can be and frequently are different and that it is the knowledge of ''the person making it so payable'', as distinguished from the ''maker'' or ''drawer'' of the check, which is controlling. (*Rancho San Carlos, Inc.,* v. *Bank of Italy,* 123 Cal. App. 291 [11 Pac. (2d) 424].) In the San Carlos case the court, at page 295, said: ''It has been held that the words 'person making it so payable' refer to the person who actually drew the check whether he be the nominal maker or not. (*Mueller et al.* v. *Liberty Ins. Bank,* (187 Ky. 44 [218 S. W. 465]) *supra; American Sash etc. Co.* v. *Commerce Trust Co.,* (Mo. App.) 25 S. W. (2d) 545.)''

In the case of *Mueller et al.* v. *Liberty Ins. Bank,* 187 Ky. 44, at page 48 [218 S. W. 465], the court said: ''Appellant would have us construe this clause 'and such fact is known to the person making it so payable' as applicable to the maker of the bill rather than the 'person making it so payable'. That is, that Mueller and Morton must be chargeable with the notice that the checks were made payable to a fictitious person before the checks can be considered as payable to bearer. If this were its meaning, then the whole provision would be ineffective in practically every case where the purpose of the person drawing the check was fraudulent, . . . Such, however, is not its meaning, as it is plain from the very language employed as well as the evident intent of the enacting power. The words 'the person making it so

payable', given their ordinary meaning, refer to the person who actually drew the bill, whether he be the nominal maker or not. Had the legislature intended that this should refer not to the person drawing the check but to the nominal maker, more fitting language certainly would have been employed, as might easily have been done." (See, also, *Bartlett* v. *First Nat. Bank,* 247 Ill. 490 [93 N. E. 337]; *Phillips* v. *Mercantile Nat. Bank, supra; Snyder* v. *Corn Exchange Nat. Bank,* 221 Pa. 599 [70 Atl. 876, 128 Am. St. Rep. 780].)

It will be noted that in the San Carlos case, *supra,* "the person making the check so payable" was not *even a signer.* The nominal maker signed a blank check and delivered it to an employee, thereby clothing the employee with power to designate the payee and fix the amount. The nominal maker did not know that the check was drawn to a fictitious payee. The trusted employee did. The court held the employee to be "the person making the check so payable", saying at page 295: " . . . and in principle the same rule should apply where the person who actually makes the check payable is expressly or impliedly authorized to complete it in that manner."

Other cases in which the name of the payee was left blank and afterward inserted, in which it was held that the checks became "bearer" paper upon the insertion of a fictitious payee, are: *Cassetta* v. *Baima,* 106 Cal. App. 196 [288 Pac. 830]; *Rich* v. *Starbuck,* 51 Ind. 87 (1875); *Johnson Harvester Co.* v. *McLean,* 57 Wis. 258 [15 N. W. 177, 46 Am. St. Rep. 39] (1883); *Chemung Canal Bank* v. *Bradner,* 44 N. Y. 680 (1871); *Wilson* v. *Kinsey,* 49 Ind. 35 (1874); *Edelen* v. *Oakland Bank of Savings,* 39 Cal. App. 302 [178 Pac. 737]. The Edelen case was not decided on the above principle, but it quite definitely could have been, although the result reached would have been the same.

The case of *Los Angeles Inv. Co.* v. *Home Sav. Bank, supra,* is as to the facts practically identical to the case at bar *except* that one Emory, the perfidious employee in the case, *did not have the authority to execute checks.* The question arose in that case as to whether or not the checks made to nonexisting persons were made to fictitious payees. The court said:

"It is also true that the payee named in several of the checks had no existence in the mind of Emory, and that the payees named in all of the others with one exception—that prepared on a *bona fide* demand—were persons to whom Emory did not intend the checks to come. As to Emory, the payees, with the single exception noted, were all fictitious. The question is, Were they fictitious as to the plaintiff company?

"The answer to this question obviously depends upon whether Emory's intention that the checks be made payable to persons who were not to receive the paper, who were non-existent so far as the checks were concerned, is attributable to the company. The Bank's counsel in their briefs say: 'But appellant did intend something when it issued the checks. What was it? It intended that the money be paid to the person to whom it was intended to be paid—and the money was so paid.'

"This is the very crux of the matter. But is it true? Plainly it is not. Emory did not execute the checks on behalf of the company. It is the intention of the officers who did that must be taken to be the intention of the company. The execution of the checks was clearly within the scope of their authority, not within that of Emory. As to these officers, it is plain that they did not intend to execute checks to fictitious parties or to pay money to the person to whom it was indicated it should be paid, to-wit, himself. They intended to pay money to what they believed to be existing persons, and this being so, the checks cannot be considered as made to fictitious payees."

The above excerpts from the Home Savings Bank case are approved in a number of cases where the check is made to a fictitious or nonexisting person and was so intended by the person who actually signed the check on behalf of the maker, such signer having authority to sign. Checks so made are held to be "bearer" checks. In the case of *Phillips* v. *Mercantile Nat. Bank, supra,* one Bartlett, cashier of the Bank of Sumter, of South Carolina, drew twelve checks which were paid by the defendant bank and thereafter debited to the Bank of Sumter. Bartlett drew these checks in the names of payees who actually resided in Sumter and who were customers of the bank. They knew nothing of the checks which were not drawn against their funds, and had no connection

whatever in the transactions of Bartlett in issuing the checks. Bartlett, after having drawn the checks, indorsed them in the name of the payee making them payable to the order of a firm of stock brokers in New York, who collected them from the defendant bank. By manipulation of the books Bartlett was able to prevent a discovery of this fraud until after he had absconded and the insolvency of his bank was disclosed. The court said: " . . . that the intention was to treat them (the payees named who were existing persons but had no interest in the checks) as being fictitious persons is manifest. As cashier invested with authority to draw checks upon the bank's account, . . . he drew them to the order of persons who had no interest in them, and thereupon wrote their names under a direction to pay to the real parties, who were intended to be the recipients of the funds drawn upon. If the checks had been drawn directly to the order of the real parties, the defendant would undoubtedly have been protected in paying them. As it was, the payees were fictitious persons in the eyes of the law. . . . The fictitiousness of the maker's direction to pay does not depend upon the identification of the name of the payee with some existent person, but upon the intention underlying the act of the maker in inserting the name. . . . " (Page 562.)

The court then draws the distinction between the type of case in which a perfidious employee has authority to draw checks and one in which he has no such authority: "The distinction between such a case and the many other cases, which the plaintiff's counsel cites from, is in the fact that it was within the scope of this cashier's powers to bind the bank by his checks."

The same distinction is accurately drawn in the Home Savings Bank case, *supra,* where the court says (at page 606): "Nor is the company bound by the guilty knowledge of Emory. That knowledge was adverse to his company and such as in the nature of things he would not communicate to it. It is elementary that a principal will not be charged with knowledge of an agent under such circumstances. (*Henry* v. *Allen,* 151 N. Y. 1 [36 L. R. A. 658, 45 N. E. 355]; *United etc. Co.* v. *Central etc. Bank,* 185 Pa. 586 [40 Atl. 97].) *This, of course is very different from an agent binding his principal by acts done within the scope of his*

*authority*, although done with knowledge and intent adverse to his principal, and we have no intention of saying that an agent may not bind his principal under such circumstances. It may well be that in this case, if Emory had had authority to draw checks, and had drawn these particular ones making them payable to fictitious payees, his intent in this respect would, in legal effect, as to third persons be the intent of the company, although such intent was adverse to the company and part of a scheme to defraud it. But charging a principal with knowledge merely because such knowledge is possessed by an agent, and charging him with acts done by the agent within the scope of his authority, are not the same thing, and it is only in the latter case that the principal may be bound by the uncommunicated information or intent of the agent when such information or intent is hostile to the principal. *The point in this case is that the checks were not executed by the guilty agent;* we are not concerned with an act done by him within the scope of his authority, and, therefore, his guilty intent and knowledge are not the intent and knowledge of his principal. The intent and knowledge of the principal was, as we have said, that of the officers who drew the checks, and they were wholly innocent of any intention of drawing checks to fictitious payees.'' (Italics ours.)

It will readily be understood, therefore, that if in the instant case the employee, Downs, had no authority to sign checks the questions here presented could be answered completely by the Home Savings Bank case, *supra,* and the judgment of the trial court would be correct. (*United States Cold Storage Co.* v. *Central etc. Bank,* 343 Ill. 503 [175 N. E. 825, 74 A. L. R. 811]; *Shipman* v. *Bank of State of New York,* 126 N. Y. 318 [27 N. E. 371, 22 Am. St. Rep. 821, 12 L. R. A. 791]; *American Sash & Door Co.* v. *Commerce Trust Co.,* 332 Mo. 98 [56 S. W. (2d) 1034].) It will also be readily understood that if in the case at bar Downs alone were authorized to sign checks without the necessity of any cosigner the case would be just as easy of solution and the judgment of the trial court would be incorrect. (*Bartlett* v. *First Nat. Bank, supra; Phillips* v. *Mercantile Nat. Bank, supra; Snyder* v. *Corn Exchange Nat. Bank, supra; Mueller et al.* v. *Liberty Bank, supra; Rancho San Carlos,*

*Inc.,* v. *Bank of Italy, supra; Edelen* v. *Oakland Bank of Savings, supra; Otis Elevator Co.* v. *First Nat. Bank,* 163 Cal. 31 [124 Pac. 704, 41 L. R. A. (N. S.) 529].) The specific question which is presented then is whether the intention of Downs, who was authorized to draw checks, to have said checks drawn in favor of fictitious payees is binding upon the maker of the checks, to wit, the corporate principal, irrespective of the fact that it was necessary for said checks so drawn by Downs to be cosigned by some other employee or officer of respondent. This question has never been decided.

■ In our opinion, the principles enunciated in the Home case and in the other cases cited, particularly that of *Rancho San Carlos, Inc.,* v. *Bank of Italy, supra,* warrant and impel an extension of the doctrine laid down by the Home case and indorsed by the other cases that "the intent and knowledge of the principal was, as we have said, that of the officers who drew the checks" (Home Savings Bank case, *supra,* p. 607), so that a maker or drawer of a check is bound in every instance where multiple signatures are required, by the intention of a single person with reference to such check when it is necessary for such single person to do something in the making of the check essential to its validity which is done within the scope of the authority of such single person and when such single person is the person, who within the scope of his authority, actively creates the check or puts it into circulation. ■ Any check so made or circulated would and should be a "bearer" check within the scope of subdivision 3, section 3090 of the Civil Code as said section has been construed by the cases, and as, indeed, common sense dictates its construction. An analysis of the San Carlos case, and the Otis Elevator case, *supra,* demonstrates that the original principle has been in fact already so extended.

An analysis of the cases based in all respects upon similar facts as the case at bar (with the exception of the dual character of the signatures here involved) in which frauds have been perpetrated by employees and in which the banks have been held responsible shows clearly that the line of demarcation in every one of them has been that the employees involved had no authority to make checks. Such cases hold that since such employee could not within the

scope of his authority utter a check his intention could not bind his employer. In those cases in which the banks have been held blameless, the employee or officer did have authority to utter checks, but in all such cases only one signature was required, which was the signature of the faithless employee.

Our attention has been called to two anomalous cases in which the bank has been held blameless where dual signatures were required. (*P. & G. Card & Paper Co., Inc.*, v. *Fifth Nat. Bank*, 172 N. Y. Supp. 688; *Hackensack Trust Co.* v. *Hudson Trust Co.*, 119 Misc. 689 [197 N. Y. Supp. 158].) The Hackensack case differed from the instant one in one important fact which might have some significance. This case will be referred to hereafter. The case upon the authority of which the P. & G. Card & Paper Co. case was decided, to wit, *Hartford* v. *Greenwich Bank*, 157 App. Div. 448 [142 N. Y. Supp. 387], has been overruled by the New York Court of Appeals in *Barnhard Ulmann Co.* v. *Central Union Trust Co.*, 257 N. Y. 563 [178 N. E. 796], so it is not accepted as authority or relied upon, although it may be classified as one of the "imposter" cases, with which we are not here concerned.

In our opinion, the difficulty in the instant case is, in view of the facts, created by the theoretical significance attached to the second signature. We do not question the proposition that the intention with which the check is drawn is all-important to a decision as to whether or not it was drawn to a fictitious payee. We reassert said principle. There is, however, no more reason to say that the intent must be that of a cosigner than to say it must be that of the actual maker, to wit, the corporation. The controlling intent is that of the person who within the scope of his authority does the final thing which gives vitality to the check or who places it in circulation. In this case, if the two cosigners of the checks were participants in the fraud, no one would question the responsibility of plaintiff. Respondent in fact concedes responsibility if this be assumed. Yet the plaintiff employer, the actual maker, would have had no actual intention of drawing the checks in such assumed situation any more than did the employers in the cases where they were the actual makers but in which authority to draw checks had been given to a single person.

It is common business practice for companies to require two persons to sign checks as a condition precedent to their validity. Not infrequently, however, one of the signers will sign a number of checks in blank, thus, in effect, relying upon his cosigner to formulate the intention of the drawer of the check, to wit, the corporation. How does such a situation differ from one in which a single signature is required? The cosigner does not, any more than the corporation, have and does not intend to have any active part in the actual drawing of the check. Such cosigner affixes his signature within the scope of his authority. Life is fused into the check by the one who finally signs. If it is just or logical to say that the cosigner relied upon his colleague to draw only proper checks, then it is fully as logical and just to say that a corporate employer which authorizes a single signature places its reliance upon the same belief. The practical fact of the matter is that the confiding cosigner or corporation, or both, has or have no specific intent with reference to such checks, whether they were properly or improperly drawn, and that the only specific intent with reference to such checks is that of the person who within the scope of his authority gives them life.

On the facts of this case the cosigners of Downs were mere automatons. Their names on the instruments gave them no more validity than did the corporate name printed thereon. They had just as much general intent with reference to the instruments involved as their corporate employer, and no more. For all practical purposes their names as well as that of the corporation might have been printed upon the checks. It is difficult to understand why any insurmountable legal barrier is created merely because on the facts in this case cosigners were required to affix and went through the motions of affixing their names at the time the checks were in the process of being drawn. If the cosigners had signed the checks in question in blank, then based upon every rule of reason and on the clear authority of the San Carlos case, *supra,* the checks were "bearer" checks. It would be no answer to say that authority to sign in blank was not given, for the act of signing would be within the scope of the authority of the cosigners. The facts in this case establish beyond cavil that the cosigners did, as a practical matter, sign in blank.

It may be assumed that theoretically the purpose of two signatures is to establish a check between cosigners in addition to such supervision as exists always in the board of directors. Theoretically there is always supervision between a single signer and the board of directors as well as between such signer and intermediate officers of greater authority. But the mere fact that the board of directors or such superior officers do not in fact or in time exercise such restraint or supervision, does not prevent a check drawn by a single signer under the circumstances here detailed from becoming "bearer" paper.

It may be urged that in the case of a single signature there is a proper delegation of authority from the board to the single signer, and that such single grant of power makes it conclusive upon the corporation, whereas, where it is a delegation of power to two, one cannot delegate to another. We are not, however, here concerned with the rule that one agent cannot delegate his authority to another. Here there is no question of delegation of power. The cosigners with Downs each exercised their power but did it in a manner so careless that the corporate employer would have been as secure if no grant of power had ever been made to such cosigners to cosign checks. This power having been granted, however, and having been exercised by the cosigners within the scope of their authority is as binding upon the corporation as if it had been exercised with the greatest of prudence.

It may be justifiably assumed that it was not contemplated by the corporation that the cosigners of Downs were authorized to sign checks in blank or checks unsupported by the proper vouchers or merely because Downs had already signed them, and yet if they had signed under any such circumstances the checks so signed by them would be binding upon the corporation because they were acting within the scope of their authority. The fact is that they did so sign repeatedly under the two latter situations and, in practical effect, signed altogether as if they had signed in blank.

It has undoubtedly been noted that in the foregoing we have designated the exercise of authority by the cosigners as "in a manner so careless". The phrase has been deliberately used, but it should be made clear that this

decision is not rested upon negligence as such as between the respondent and appellant. The use of the phrase is confined to the effect which we believe the conduct of the cosigners has in fixing the character of the checks involved as "bearer" paper.

Appellant does assert most vigorously that it should be freed from liability on the ground of negligence alone. We do not agree with this contention. The identical defense was urged in the Home Savings Bank case, *supra*. The authorities are there summarized and the court held on similar facts that the negligence of the employers (if any) cannot be classified as a direct and proximate cause of the cashing of a check on a forged signature by the bank. It was further held in that case that the bank's responsibility is not grounded in tort but upon its contractual liability "to pay out the depositor's money only on the order of the depositor and in accordance with that order", and that the further question of the negligence of the maker of the checks was not therefore germane. Aside from the fact that the negligence asserted, if any were found, is unrelated to the alleged negligence of the bank, it was directly held in the Home Savings Bank case, *supra,* that a large corporation, conducting its business as did the plaintiff here, is not on the facts validly subject to a charge of negligence because one officer performing within the scope of his authority without investigation acts upon facts submitted by some employee acting within the scope of his authority. The Home Savings Bank case, however, as well as all of the cases in which the banks are held liable, involve frauds perpetrated by employees who had no authority to draw checks but who nevertheless caused such checks to be drawn by imposing upon officers who did have such authority.

It may be conceded, as a matter of logic, that if it has been held that a corporation is not negligent when an employee under the circumstances outlined by the facts imposes upon an officer, there is greater reason for holding a corporation free from negligence when the information upon which action is taken is submitted by an officer of the corporation with some executive powers to an employee or another officer who must act thereon. If this be so, there would be no negligence in the instant case on the part of the cosigners of Downs. Such conclusion, however, does

not affect the propriety of determining whether or not the conduct of the cosigners of Downs was such, that the legal result is that Downs alone was the person who made the checks payable to fictitious payees and that he alone fixed the character of the paper to be uttered and circulated for the corporation. . The conduct of the cosigners, whether it be considered negligence or not, while entirely unrelated to that of the alleged negligence of the bank, is nevertheless binding upon their corporate employer, when the question to determine, is the nature and effect of the act of the corporation without reference to any act of the bank. (*Otis Elevator Co.* v. *First Nat. Bank, supra; Edelen* v. *Oakland Bank of Savings, supra.*)

In the line of cases in which the banks have been held responsible, the employees, who perpetrated the frauds, never could do anything to make the checks valid. In such cases, the intent of the employees is beside the mark, since it is beyond the scope of their authority to draw checks for their specific fraudulent purpose or for any lawful purpose; their intent is never binding on the corporation. In the language of one of these cases: "His intention in regard to the check was of no importance for he had nothing to do with giving it vitality." (*United States Cold Storage Co.* v. *Central etc. Bank,* 343 Ill. 503, 507 [175 N. E. 825, 74 A. L. R. 811].) In this type of case, the signer of the checks could take it for granted that once the check was completed it would have to be used for the purpose for which the signer intended it to be used, or it would not be an obligation of such signer's employer. In these cases the faithless employees have no authority other than to receive the checks after their execution and deliver them to the payees. Again quoting from the foregoing Illinois case: "If this was the fact, and if instead of delivering the checks as it was his duty to do, he abandoned his agency and disregarded his duty, and, converting the checks to his own use forged the names of the payees, cashed the checks and received and appropriated the proceeds to his own use, his acts were neither within the scope of his authority nor in the course of his employment." (*United States Cold Storage Co.* v. *Central etc. Bank, supra,* p. 518.) In the case at bar the cosigners of Downs had no such legal security. On the contrary, it must be assumed that

they knew that until Downs had signed the check it was no check.

We are thus impelled to one of two conclusions. The corporate respondent in this case recognized how impossible it would be for cosigners to make even a cursory investigation of checks submitted by Downs and did a useless thing by requiring cosignatures; or it was the intention of the corporate employer that, whether checks were submitted by Downs or by whomsoever submitted, that such checks be investigated by the cosigners. It is fair to assume that of the two, the latter was the intention of the corporate employer. The board of directors of respondent was not ignorant of the fact that between 3,000 and 5,000 checks were drawn each month. The board must have known that it takes time and care to inquire into that many transactions. Yet by its mandate, certain individuals were selected to perform this duty. These individuals omitted to investigate and supervise, as directed, but inasmuch as they, by signing, acted within the scope of their authority, their act is as binding upon their principal as if they had signed in blank, or as if they had actually known what they were doing. If the corporate employer of Downs did not intend the cosigners to investigate, but merely required them to sign their names so that they could attain perfection in that respect, then such cosigners were performing a useless automatic act which could require no intent and it was clearly the intention of the corporate employer to allow Downs and Downs alone to fix the character of the checks and give them vitality. If this be so, then the intention of Downs is controlling and the checks are "bearer" paper.

There is another cogent reason why the checks in this case must be held to be payable to bearer irrespective of the method of signature or the knowledge of those who signed. The uncontradicted fact is that an officer of the plaintiff who had an unquestioned right to circulate and deliver checks, and this without advising anyone of his intention to circulate and deliver such checks, knew that they were payable to a nonexisting person but nevertheless proceeded to place said checks in circulation. As to this phase of the case, the court in *American Sash & Door Co. v. Commerce Trust Co.*, 332 Mo. 98 [56 S. W. (2d) 1034, 1043], says:

"The knowledge and intent of the maker in putting the check into circulation would, therefore, be pertinent (*Shipman* v. *Bank of N. Y., supra,* 126 N. Y. loc. cit. 330 [27 N. E. 371, 12 L. R. A. 791, 22 Am. St. Rep. 821]; *Harmon* v. *Old Detroit Nat. Bank,* 153 Mich. 73, 79 [116 N. W. 617, 17 L. R. A. (N. S.) 514, 126 Am. St. Rep. 467]), and if a maker should draw a check not knowing the payee to be nonexistent or fictitious, but should nevertheless utter it after learning that fact, we should say that the check would be payable to bearer. Similarly, if one authorized officer of a corporation, say, should thus innocently draw the check, and another officer with discretionary power to deliver should put the check into circulation knowing the payee to be fictitious or nonexistent, it would seem that the same result would follow."

Again, it must be borne in mind that the situation with respect to an officer who acts within the scope of his authority is entirely different from the situation treated in those cases wherein the banks are held responsible. In the latter type of case, the employee has no authority except to deliver to specifically named payees who are believed to be *bona fide* existing persons by the signer or signers who have authority to make a check. On the facts of this case, Downs had the authority to deliver checks to anyone and everyone, real or fictitious. Since he acted within the scope of his authority, his act, intent and knowledge, though adverse to and a fraud upon his principal, are nevertheless binding upon his principal. (*Otis Elevator Co.* v. *First Nat. Bank, supra.*) In the case here cited the court said: "Of course the preparation and presentation to appellant for payment by Bliss of checks which were valid and unaltered checks of respondent payable to 'cash' or 'bearer' or indorsed to Dickinson, were acts within the scope of and in the direct course of his employment. And while it is true that as to the presenting of forged and altered checks Bliss was acting without the scope of his authority which authorized him to present only valid checks, still as far as the appellant bank is concerned, Bliss, in the preparation and presentation of this altered check, was acting within the direct scope and course of his employment which consisted in preparing and presenting checks of respondent payable to 'cash' or 'bearer', or to the order

of Dickinson for payment by it. . . . In the application of the rule we have been considering, it is of no consequence that the check here in question presented by Bliss was in fact a forgery on his part. The rule is based on the fact that as to the particular transaction the agent had exceeded his authority, actual or apparent. Whether in doing so the agent has been guilty of a breach of faith with his principal, or has committed a crime, is of no controlling moment as affecting the responsibility of the principal to third persons injured thereby. It is enough to fix the responsibility of the principal in behalf of an innocent third party if the agent, though acting criminally, was nevertheless in perpetrating a fraud thereby on said third party, acting within the course of his employment.'' In the Otis Elevator case the court before making application of the above principle to the facts of that case said: ''Our attention has not been directed by counsel on either side to any case presenting a similarity of facts to those presented here. But there are principles of law which in their scope have been made applicable in cases which, while not identical as to facts, yet are sufficiently analogous to make the doctrine therein laid down applicable here.'' The court then cited and discussed in some detail the cases upon which it bottomed its decision.

In the other set of circumstances an employee, whose intent is immaterial so far as it becomes a binding part of the *animus* of his principal, is instructed to perform a ministerial act, to wit, to deliver a check to a person assumed to be existing and named therein. If the assumed person does not exist, the employee so far as the scope of his authority is concerned, can function no further and if he did it would not be binding upon his employer. Thus in the case of *American Sash & Door Co., supra,* page 1043, it is said: ''For, where the authorized officer of a corporation draws the check in ignorance of the fact that the payee is fictitious or nonexistent, and the check is put in circulation by an employee acting outside the scope of his authority, the statute does not apply and the check is not payable to bearer because in such circumstances the corporation would be without either actual or constructive knowledge of the fictitious status of the payee.'' In the Otis

Elevator case, *supra* (at pp. 47 and 48), the court recognizes this distinction.

 It has been well settled that when negotiable paper, regular on its face, is delivered or circulated by the maker thereof, with indorsements thereon, such indorsements will be deemed valid and genuine in the hands of a *bona fide* holder. The rule is stated in 2 Morse on Banks and Banking, paragraph 477, as follows: "Whatever signature or endorsement is upon an instrument when issued by the drawer or maker will be deemed good against him in the hands of a *bona fide* holder. His delivery of the paper affirms its correctness, and if the name be forged the amount paid on the bill may be recovered by the drawee from the drawer."

In the case of *Litchfield Shuttle Co.* v. *Cumberland Valley Nat. Bank,* 134 Tenn. 379 [183 S. W. 1006], which dealt with the effect of circulating a check by the maker after an indorsement of the payee's name had been forged, the defendant bank defended on the ground that it paid such check pursuant to the direction of those who had authority to represent the drawer of the check and direct the payment of the funds of such drawer. The court said: "So far as the bank was concerned, Hooper (the employee who drew the check forged the payee's name and thereafter circulated it) had authority to draw the checks in controversy and had authority to put them in circulation. Complainant's auditor testified that the indorsements on the check in suit were in the handwriting of Hooper. Therefore, when the checks were issued by Hooper, who had authority to draw and issue them, they already bore the endorsements said to have been forged. . . .

"These checks appear to have been cashed or to have been put in circulation by Hooper himself, complainant's superintendent. They bore the forged endorsements at the time they were negotiated by Hooper, and in view of this conduct of complainant's representative within the apparent scope of his authority, we think complainant is not entitled to relief against the Bank. . . .

"When Hooper negotiated these checks, under the provisions of section 65, he warranted that they were genuine and in all respects what they purported to be . . . " The

section 65 referred to is the same as section 3146 of our Civil Code.

In the same case the court concludes by saying:

"When the complainant by its general manager issued these checks bearing the endorsement of the several payees, it thereby admitted the genuineness of the signatures, and it is now precluded from asserting to the contrary. When the bank paid these checks thus vouched for by the duly authorized agent of the complainant, such payment was according to the drawer's own order or pursuant to the direction of one who had authority to represent the drawer." (Pages 1007, 1008.) (*Otis Elevator Co.* v. *First Nat. Bank, supra.*)

The Hackensack case, *supra,* referred to as an anomalous case, was evidently decided on this theory. In that case there were dual signatures required. The court found, however, that the corporation employer required only one signature, to wit, that of Wallace, the faithless employee. The defendant bank for some reason required two signatures. The president of the corporation testified that he signed because the signatures of two officers were required at the Hackensack Trust Company. Wallace was in sole charge of all the corporation business as manager, and was the sole person who had knowledge with reference to the checks. The president signed because he was required to do so, and knew nothing about the checks. The court gave as one of its reasons: " . . . as it was conceded that Wallace had practically sole charge of all of the corporation business as manager, and as he drew the checks and put them in circulation with full authority, his acts and intent must be deemed the act and intent of the corporation." (*Hackensack Trust Co.* v. *Hudson Trust Co., supra.*)

It follows from the above, therefore, that even with reference to plaintiff's exhibit 33, which was a check for $4,881.52 which was signed on behalf of respondent by C. C. Biehl, its cashier, and one P. H. Sullivan, but which had been prepared by Downs and which, like the other checks, was drawn to a fictitious payee, but which check was circulated and delivered by Downs, is likewise a bearer check and falls in the same classification as the other 69. Downs, an executive officer and one who was duly authorized to circulate checks on behalf of the respondent, knew

that the check was drawn to a fictitious payee but did nevertheless circulate the same, and his knowledge is binding upon the respondent.

In view of the conclusions reached it becomes unnecessary to consider the questions of negligence, to which reference has already been made, estoppel, laches, whether or not the rendition of monthly statements by appellant to respondent constituted an account stated, particularly since all of said questions are treated and answered in the case of Home Savings Bank, *supra*.

The conclusion reached as to the meaning of the language of subdivision 3, section 3090, of the Civil Code, "known to the person making it so payable" is, we feel, "neither arbitrary nor fanciful, but it is both just and equitable. The owner of the funds trusts its agent. It tells the bank to pay out its funds on his order. As between him and the bank, the latter is bound to pay whomsoever he will. If any particular check is paid to a person whom he intended to receive it, the bank has done precisely what it was instructed to do. In such cases as that here involved, it is true that the agent has proved false to his trust, and some innocent person must be the loser. Should it not be the one who gave him the power which he misused?" (*Norton et al.* v. *City Bank & Trust Co.*, 294 Fed. 839, 845.)

The judgment for plaintiff is reversed, and the judgment for cross-complainant Wells-Fargo Bank against cross-defendant Los Angeles First National Trust & Savings Bank likewise is reversed.

Conrey, P. J., and York, J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 27, 1934.

Preston, J., voted for a hearing.