[L. A. No. 18581. In Bank. May 3, 1943.]

SECURITY-FIRST NATIONAL BANK OF LOS ANGELES (a National Banking Association), Respondent, v. BANK OF AMERICA NATIONAL TRUST & SAVINGS ASSOCIATION (a National Banking Association), Appellant.

156

Louis Ferrari, Edmund Nelson and G. L. Berrey for Appellant.

Jennings & Belcher for Respondent.

TRAYNOR, J.—The plaintiff, Security-First National Bank, issues numerous checks drawn on itself. It was the sole duty of one of plaintiff's officers, A. M. Hadley, to sign such checks. Each check was presented to him with a debit slip, and if the slip showed that the check was properly authorized and that funds were available in the proper account, he signed the check. Among the employees who prepared debit slips and wrote checks, but who were not authorized to sign checks, was Dee L. Ellis, Jr., head of the accounting division of the trust department. Ellis prepared a number of checks for Hadley's signature, drawn to the order of L. W. Bobbitt, together with debit slips in the usual form on the basis of which Hadley signed the checks. There was such a person as Bobbitt, but he knew nothing of the transaction, and Ellis did not intend that he receive any of the checks. Ellis had become acquainted with one of defendant's employees and had no difficulty in establishing an account with defendant as agent for Bobbitt. He indorsed the name of L. W. Bobbitt on the checks, deposited them in this account, and later withdrew the funds deposited. Defendant presented the checks through the Los Angeles clearing house and in accord with

the clearing house rules guaranteed all prior indorsements. When plaintiff received the checks from the clearing house, they were returned to the accounting division of the trust department where they fell into the hands of Ellis, who destroyed them. By manipulation of the outstanding-checks file Ellis was able to conceal the fraud for a time, but it was eventually discovered, and plaintiff brought this suit on defendant's guarantee. Defendant appeals from the judgment for plaintiff.

Defendant invokes section 3090 of the Civil Code (§ 9(3) of the Uniform Negotiable Instruments Act) providing: "The instrument is payable to bearer . . . (3) When it is payable to the order of a fictitious or non-existent person, and such fact is known to the person making it so payable. . . . " If these checks are payable to a fictitious payee, and are therefore bearer paper, defendant's guarantee of the indorsements imposes no liability. (*Union B. & T. Co.* v. *Security-First Nat. Bank,* 8 Cal.2d 303 [65 P.2d 355].) The fact that Bobbitt was an actual person does not prevent his name from being that of a fictitious payee, for it is settled that an instrument is drawn to the order of a fictitious payee if it is not intended that the person named on its face have any interest in it. (*Union B. & T. Co.* v. *Security-First Nat. Bank, supra.*) Such a check, however, is not payable to bearer unless the fact that the payee is fictitious is known by "the person making it so payable." (Civ. Code, § 3090.)

This condition limits the extent to which the fictitious payee rule qualifies the usual rules governing the effect of forged indorsements. A forged indorsement is ordinarily a nullity. It does not pass title to a check (Civ. Code, § 3104; *Anglo-California Trust Co.* v. *French American Bank,* 108 Cal.App. 354 [291 P. 621]) and a bank may not charge to the account of its depositor a check paid on the basis of such an indorsement. (*Hatton* v. *Holmes,* 97 Cal. 208 [31 P. 1131]; *Atwell* v. *Mercantile Trust Co.,* 95 Cal.App. 338 [272 P. 799].) Where the drawer intentionally makes a check payable to a fictitious payee, he knows that it will be indorsed in the name of the payee by someone bearing another name and he thus cannot obtain the benefit of these rules. Similarly, when he entrusts an employee with the responsibility of signing his checks, the signer takes the place of the drawer. His signature creates the check and his knowledge binds the

drawer. ■ When the drawer or his signer is the victim of the fraud of the bookkeeper who is charged with examining the drawer's accounts and informing him of his liabilities, the person buying or paying the check has no right to a release at the expense of the innocent drawer from the responsibility of determining the authenticity of the indorsements. (See Brannan's Negotiable Instruments (Beutel's sixth ed. 1938) p. 223, 224.)

■ Hadley, not Ellis, was the signer of plaintiff's checks. Defendant, however, asserts that Hadley acted as a mere automaton, and that Ellis's authorization was in effect an order to him to execute the checks. While Hadley ordinarily signed in reliance on vouchers executed by Ellis, the record shows that he refused on at least one occasion to sign a check authorized by Ellis. In many large businesses, it is necessary for the officer authorized to sign checks to do so in reliance on the vouchers of another employee, although that employee has no authority over him. In this situation, as in the execution of plaintiff's checks, the fraud of the employee preparing the vouchers automatically leads to the unwitting execution by the signer of checks to fictitious payees. Since this severance of the function of investigating disbursements from that of executing checks creates the only situation in which checks can be commonly executed to a fictitious payee without the knowledge of the person making them so payable (See Note, 74 A.L.R. 822), it is probable that the requirement of knowledge was included in the section to prevent such checks from becoming payable to bearer. Thus, in *Los Angeles Investment Co.* v. *Home Savings Bank,* 180 Cal. 601 [182 P. 293, 5 A.L.R. 1193], one Emory, the manager of the insurance department of a real estate firm, prepared requisitions representing false insurance claims. He was not authorized to sign checks. On the basis of his requisitions another officer signed checks drawn to the order of various persons, and in their names Emory signed and negotiated them. It was held that those checks were not payable to bearer, because the officer signing them was the person making them payable to a fictitious payee, and he had no knowledge that the payee was fictitious. Defendant attempts to distinguish the Home Savings Bank case on the theory that the representations of the defrauding employee were there subject to an independent audit, so that they were not the direct cause of the execution of the fictitious payee checks. The opinion, however, attaches

no significance to this fact, declaring unequivocally that fictitious payee checks are not payable to bearer unless the signor is aware of the fraud. Throughout the many years since the Negotiable Instruments Law was drafted, this interpretation has been adopted almost universally throughout the country. (See Brannan's Negotiable Instruments, *supra,* p. 208 et seq., and the long list of cases there cited; 7 Am.Jur. 844; 10 C.J. 580.) Since the same result was commonly reached in this country before the adoption of the Negotiable Instruments Law (see Kulp, The Fictitious Payee, 18 Mich.L.Rev. 296; Note, 22 A.L.R. 1229) the decision in the Home Savings Bank case and similar cases may be supported on the theory that section 9(3) of the Negotiable Instruments Law was intended to codify the common law. The question whether it was sound policy to adopt the rule is one for the Legislature to decide.

Defendant relies particularly on *Union Bank & Trust Co.* v. *Security-First Nat. Bank, supra, Goodyear Tire & Rubber Co.* v. *Wells Fargo Bank,* 1 Cal.App.2d 694 [37 P.2d 483], and *Rancho San Carlos* v. *Bank of Italy,* 123 Cal.App. 291 [11 P.2d 424]. The Union Bank & Trust Co. case involved the fraud of one Williams, the director and assistant secretary of two corporations that maintained accounts at the Union Bank. He was authorized by his employers to sign checks, on which counter-signatures were also required. He drew and signed checks on his employers' accounts and procured the necessary co-signatures. He presented these checks to the Union Bank, and upon a written requisition on behalf of his employers, drawn and signed by himself, purchased cashier's checks to the order of the payees designated in the requisitions. He later indorsed the checks in the name of the payees and deposited them. It was held that the checks were payable to bearer. The court emphasized the special situation of a bank in issuing cashier's checks, a form of currency for which the bank is paid in advance. It is not concerned with who the payee should be. For this reason the knowledge of the purchaser may determine whether a cashier's check to a fictitious payee is payable to bearer. Williams, as authorized by his employers, purchased and designated the payee of the cashier's checks. The court also emphasized the fact that Williams was authorized to sign his employers' checks. He could therefore have drawn fictitious payee checks against his employers' account that would have been payable to bear-

er. The court concluded that the same result followed when Williams used this authority to sign personal checks as the means of causing the execution of cashier's checks to fictitious payees.

In the Goodyear Tire and Rubber Co. case one Downs was authorized to sign checks, which, however, were not valid until signed by certain co-signers. Downs drew and signed a number of checks and his co-signers signed on the strength of his signature. He then forged the indorsements of the payees and collected the checks. The court pointed out that Downs knew that the payee was fictitious when he drew and signed these checks, and made it clear that the requirement of co-signers did not restrict the effect of his knowledge. Since the joinder of the co-signers was automatic, the court treated the case as if Downs were the sole signer, and concluded that the checks were payable to bearer. The opinion, however, expressly asserts that if Downs had not been the signer of the checks, his knowledge would not have been controlling.

In *Rancho San Carlos* v. *Bank of Italy, supra,* an employee was entrusted with signed blank checks and was authorized to fill in the blanks. He completed them in the names of fictitious payees, indorsed the checks in those names and then negotiated them. It was held that they were payable to bearer. The court viewed the authority to complete a signed blank check by filling in the name of the payee and the amount payable as the equivalent of the authority to sign an otherwise complete check.

 Defendant in the present case contends that Ellis delivered the trust department checks because they were sent to the payees by the accounting division. Delivery of a negotiable instrument, however, is not essential to its execution. A check is complete when received by the person who is to deliver it, and lack of delivery is no defense against a holder in due course. (Civ. Code. § 3097.) Ordinarily, therefore, the signer remains the person making the completed check payable to a fictitious payee regardless of whether another employee is responsible for seeing that it reaches the payee. (*Los Angeles Investment Co.* v. *Home Savings Bank, supra;* *United States Cold Storage Co.* v. *Central Mfg. Dist. Bank,* 343 Ill. 503 [175 N.E. 825, 74 A.L.R. 811]; *Seaboard Nat. Bank* v. *Bank of America,* 193 N.Y. 26 [85 N.E. 829]; *Jordan Marsh Co.* v. *National Shawmut Bank,* 201 Mass. 397

[87 N.E. 740, 22 L.R.A. N.S. 250]; *City of St. Paul* v. *Merchants' Nat. Bank,* 151 Minn. 485 [187 N.W. 516, 22 A.L.R. 1221].) A contrary conclusion has been arrived at when an employee has discretion to decide when and whether checks shall be delivered. (See *Goodyear Tire & Rubber Co.* v. *Wells Fargo Bank, supra,* and cases there cited.) The soundness of these decisions need not be considered, since the claim that Ellis had such authority is based only on conjecture. The evidence shows merely that the checks were returned to the accounting division to be forwarded to the payees.

After the checks were cleared they were returned to the trust department accounting division, which was under the supervision of Ellis, and there examined and balanced against the file of outstanding checks. Defendant concludes from these facts that Ellis was the officer who paid them, and argues that in so paying them Ellis represented that he knew of nothing wrong with the checks or their indorsements, and accepted defendant's guarantee of the indorsements without disclosing that they were forged. Defendant contends that because Ellis performed these acts in the course of his employment, plaintiff is estopped from denying the validity of the indorsements. The checks were not paid merely by the settlement at the clearing house. This settlement is usually tentative only, and the cleared checks are not regarded as paid until the time has passed under the clearing house rules during which the drawee bank can return them to the forwarding bank. (*Sneider* v. *Bank of Italy,* 184 Cal. 595 [194 P. 1021, 12 A.L.R. 993].) It is difficult to regard any one employee as paying the checks. If one were to be singled out it would most likely be the employee who has authority to decide whether or not the checks should be returned to the forwarding bank. There is no showing that Ellis had such authority.

The judgment is affirmed.

Gibson, C. J., Curtis, J., and Edmonds, J., concurred.

SHENK, J.—I dissent. In my opinion the judgment should be reversed for the reasons stated by the District Court of Appeal of the Second Appellate District, Division Three, in an opinion prepared by Justice Hartley Shaw, acting *pro tempore,* and concurred in by the then Presiding

Justice B. Rey Schauer and Justice Parker Wood. I am satisfied that that opinion correctly interprets the statute and case law of this state as applied to the facts and reaches a conclusion which is consonant with reason and justice. I adopt it as a reflection of my views on the subject. It is as follows:

"There are two defendants in this action, but, since the defendant bank only is before us on this appeal, the word 'defendant' where hereinafter used, refers to it only, unless otherwise indicated. The plaintiff issued certain checks drawn upon itself, which came to the defendant upon forged indorsements. The defendant impressed its clearing house stamp upon these checks, presented them to plaintiff through the clearing house and obtained payment. This stamp included the words, 'all prior endorsements guaranteed,' and plaintiff brings this action to recover on that guaranty. Judgment went for plaintiff and defendant appeals.

"The checks in question were drawn and signed in plaintiff's trust department, and purported to be made for payments due from trusts held by it, to the order of a person named L. W. Bobbitt. Plaintiff had in its trust department several divisions, including an accounting division, the head of which was the other defendant, Ellis, who had no official title. All of these checks were false and fictitious checks, written by Ellis, but not signed by him, he having no authority to sign checks for plaintiff, and none of them represented any actual payment due from plaintiff. After they were signed Ellis obtained possession of them, indorsed the name of L. W. Bobbitt upon them and deposited them in an account he had opened with defendant bank, at one of its Los Angeles branches, in the name of Bobbitt. Ellis then drew the money out of defendant bank, on checks to which he signed Bobbitt's name, and used it himself. In dealing with defendant bank Ellis did not pose as Bobbitt, but as the latter's agent, making all of the signatures except the first indorsement before presenting them to the bank. There was such a person as L. W. Bobbitt known to Ellis, but he did not live in California, had nothing to do with these acts of Ellis, knew nothing of them, had no interest in the checks, was not intended by Ellis to have either the checks or the money procured on them, and did not in fact receive either.

"The mode in which Ellis accomplished this defalcation is

described in much detail in the record, but a brief statement of it here will suffice. In its trust department plaintiff had an assistant trust officer named Hadley, who was also an assistant secretary. He was referred to as a 'signing officer' and his sole function was to sign checks and other papers and documents coming from the trust department. He signed from 800 to 1500 of these various papers a day, and of course had no time to investigate the various transactions out of which they arose, to see if they were proper, and was not expected to do so, but acted on the assurances of others authorized to give them. When his signature on a check was desired, the check, fully made out, was presented to him, together with a 'debit ticket,' which showed the name of the payee, the purpose for which the check was drawn,. its amount and the number of the trust involved. At the bottom of it were also separate spaces headed respectively by the words 'Prepared by,' 'Authorized by,' 'Signed by,' and 'Funds O. K.' In these spaces initials or names of certain authorized persons were written by them. When a check and one of these tickets was presented to Hadley his custom, as he testified to it, was to look first to see if one of the authorized persons, of whom he had a list, had signed under 'Authorized by,' and then 'to see if the ''Funds O. K.'' was initialed by a person having authority to so initial it; and then I examined the amount set forth in the ticket, and turned it over and examined on the check to see if it was protectographed in that amount; and then I initialed it under ''Signed by'' and signed the check.' He did not look to see who the payee of the check was or what was the purpose of the payment or the name, purpose or number of the trust. It was physically impossible for him to do that work and the bank did not expect him to do so. Hadley naturally had no recollection of the checks involved here, but Ellis testified that he presented them to Hadley and that in signing them Hadley followed his custom as just stated. Ellis was one of the persons authorized to sign debit tickets in the places looked at by Hadley. Ellis personally wrote the checks in question and the debit tickets for them, initialed the latter and presented the checks to Hadley.

''It is defendant's contention that under the circumstances above stated, the checks in question were payable to bearer, within the intent of section 3090 of the Civil Code. If this

be so the checks could be negotiated by mere delivery, no indorsement being necessary for that purpose. (Civ. Code, § 3111.) Defendant's further contention that in such case defendant would incur no liability on its guaranty of indorsements appears to be conceded, and is correct. (*Union B. & T. Co.* v. *Security-First Nat. Bk.* (1937), 8 Cal.2d 303, 310 [65 P.2d 355].)

"Section 3090 of the Civil Code, so far as material here, reads as follows: 'The instrument is payable to bearer— . . . (3) When it is payable to the order of a fictitious or non-existing person, and such fact was known to the person making it so payable . . . ' There is no doubt that, if Ellis' knowledge and intent are regarded as determinative, all the checks in question were payable to the order of a fictitious person, and this also, plaintiff concedes. While there was such a person as Bobbitt, Ellis did not intend that he should have any interest in the checks and he had in fact no rights in them. This is sufficient to make him a fictitious payee, if Ellis was the person making the checks so payable, within the meaning of section 3090. (*Union B. & T. Co.* v. *Security-First Nat. Bk., supra.*) Of course, the character of the payee in this respect was known to Ellis, but it was not known to Hadley, who believed all checks signed by him to be regular and genuine in all respects and had no information to the contrary, nor was it known to any person connected with plaintiff, other than Ellis. The question for decision on section 3090 therefore resolves itself into these two questions: Was Ellis the person making these checks 'so payable,' or if not, was his knowledge on the subject chargeable to plaintiff?

"It is now settled that 'the person making it so payable,' within the meaning of section 3090 above quoted, is not always or necessarily the nominal maker of a check or other negotiable instrument. (*Union B. & T. Co.* v. *Security-First Nat. Bk., supra; Goodyear Tire etc. Co.* v. *Wells Fargo Bank* (1934), 1 Cal.App.2d 694, 702 [37 P.2d 483]; *Rancho San Carlos* v. *Bank of Italy* (1932), 123 Cal.App. 291, 295 [11 P.2d 424].) In *Union B. & T. Co.* v. *Security-First Nat. Bk., supra,* the checks in question were cashier's checks of the plaintiff, issued at the request of an agent of one of plaintiff's depositors, made payable to persons named by him and delivered to him. He forged the payees' indorsements and obtained the money on the checks. It was held that regarding the payees named in the checks the plaintiff had no intent

save that of following the agent's instructions and that since his intent was that fictitious payees be named, the checks were payable to bearer and plaintiff was not liable to the depositor for paying on forged indorsements. The faithless agent was named Williams and the court said on this point: 'The intended ficitious payee was the creature of Williams' mind, and while the appellant Union Bank was the nominal maker of the cashier's checks, still Williams was the person who actually drew the bill and was the person making the cashier's checks payable to a fictitious payee; and since he acted within the scope of his authority, his act, intent and knowledge, although adverse to and a fraud upon his principal, are nevertheless binding upon the latter.' (8 Cal.2d 309.)

"In *Union B. & T. Co.* v. *Security-First Nat. Bk., supra,* the court cited with approval *Rancho San Carlos* v. *Bank of Italy, supra,* and *Goodyear Tire etc. Co.* v. *Wells Fargo Bank, supra.* In the Rancho San Carlos case the plaintiff delivered to an employee named Harris, who had no authority to sign its checks, several duly signed checks on defendant bank which were blank as to payees' names and amounts. This was done, according to custom, to enable Harris to pay plaintiff's bills. Harris filled out one of these checks for $10,000, naming as payee a real person who had no interest in it and was not intended by Harris to receive it, forged this payee's name and contrived to get the money. It was held that plaintiff, by delivering the blank checks to Harris, gave him authority to fill the blanks, and further (at 123 Cal.App. 295): 'It has been held that the words "the person making it so payable" refer to the person who actually drew the check whether he be the nominal maker or not [citing cases]; and in principle the same rule should apply where the person who actually makes the check payable is expressly or impliedly authorized to complete it in that manner.' For this reason it was held that the check was payable to bearer, under section 3090 of the Civil Code, and defendant bank was not liable to plaintiff as for payment on a forged indorsement.

"In the Goodyear case, *supra,* the plaintiff sued to recover money which it had deposited in defendant bank and which the latter had paid out on duly signed checks of plaintiff. The plaintiff required two signatures on its checks, one of the authorized persons, Downs, being also its controller and in charge

of its accounts. Downs wrote a number of checks to fictitious payees, representing no obligations of the corporation, and presented each of them to a cosigner, with or without supporting documents, sometimes signing it before and sometimes after the cosigner did. The cosigners signed the checks without investigation, depending on Downs and the system for assurance of their correctness. Downs then stole the checks, forged the payees' signatures and got the money they called for. It was held that these checks were, in contemplation of law, payable to bearer, and defendant was not liable to plaintiff on account of the forged indorsements. The court discussed the matter at great length and among other things said, at 1 Cal.App. 2d 709: 'On the facts of this case the cosigners of Downs were mere automatons. Their names on the instruments gave them no more validity than did the corporate name printed thereon. They had just as much general intent with reference to the instruments involved as their corporate employer, and no more. For all practical purposes their names as well as that of the corporation might have been printed upon the checks. It is difficult to understand why any insurmountable legal barrier is created merely because on the facts in this case cosigners were required to affix and went through the motions of affixing their names at the time the checks were in the process of being drawn. If the cosigners had signed the checks in question in blank, then based upon every rule of reason and on the clear authority of the San Carlos case, supra, the checks were "bearer" checks. It would be no answer to say that authority to sign the blank was not given, for the act of signing would be within the scope of the authority of the cosigners. The facts in this case establish beyond cavil that the cosigners did, as a practical matter, sign in blank.'

"Under the facts of the case at bar Hadley was in substantially the same situation as that given to the cosigners of Downs in the case just quoted. Hadley did not even look at the names of the payees on a check and either he had no actual intent at all regarding them, or if he had any such intent it was, at most, to make the checks payable to the persons intended by Ellis, and was thus like that of the bank which issued the cashier's checks involved in *Union B. & T. Co.* v. *Security-First Nat. Bk., supra.* There must be an intent somewhere as to the payee to be named in a check and if the

signer of the check has none that intent must be sought else-where. If the plaintiff should use a check writing machine by which signatures were mechanically placed on checks, without any attention to the contents of the checks by the persons whose signatures were thus placed on them, it is obvious that such persons would have no intent whatever in regard to such checks and the intent of those authorized to operate the machine, de-void of intent, and the intent which determines the character of the check, on the question whether the payee's name is ficti-tious, must be that of the one who operated the machine, in this case, Ellis. As in the Goodyear case, *supra*, the signature, though made after the payee's name was in the check, was 'as a practical matter, in blank,' and hence is subject to the rule of the San Carlos case, *supra*.

"In opposition to this conclusion plaintiff cites and relies on *Los Angeles Inv. Co.* v. *Home Sav. Bank* (1919), 180 Cal. 601 [182 P. 293, 5 A.L.R. 1193]. The plaintiff there was a corporation doing an extensive business, with several depart-ments. One of these, in charge of one Emory, as manager, made many disbursements by check. Emory had no authority to sign checks, and to obtain a check he prepared a demand showing the purpose of the payment and the person to whom it was to be made. This demand was sent to the accounting department where it was examined and if found correct a check was prepared and presented with the demand to the officers authorized to sign checks and the signed check was returned to Emory's department for delivery to the payee. Emory, like Ellis in this case, prepared fictitious demands, and one real demand, in favor of named persons, some of whom were fictitious and some real, got possession of the checks signed for these demands, indorsed the payees' names on them and thereby obtained the money payable on them. The checks were drawn on defendant bank and plaintiff sued to recover the amount paid on these forged indorsements. One of the defenses was that the checks were in law payable to bearer, because of Emory's intent regarding them, but the court said, at p. 606, 'Emory did not execute the checks on behalf of the company. It is the intention of the officers who did that must be taken to be the intention of the company. The execution of the checks was one within the scope of their authority, not within that of Emory. As to these officers, it is plain that they did not intend to execute checks to fictitious

parties or to pay money to the person to whom Emory intended it should be paid, to wit, himself. They intended to pay money to what they believed to be existent persons, and this being so, the checks cannot be considered as made to fictitious payees.' This statement, while accurate enough as applied to the facts of that case, does not entirely conform to the later decisions just reviewed, and some limitation must be put upon it to bring it into such conformity. In that case an audit was interposed between Emory, who prepared the demands, and the officers who signed the' checks, the purpose of which was to determine whether the checks were proper or not. The signing officers were not mere automatons but acted upon the results of such audit and it was quite proper to regard them as having an intent regarding the checks. But where the actual signer of the check has and in the nature of the operation can have, no intent at all as to the payee, as where he signs in blank (*Rancho San Carlos* v. *Bank of Italy, supra*) or complies with the request of another, with no intent except to do what is asked (*Union B. & T. Co.* v. *Security-First Nat. Bk., supra*), or is a mere automaton signing without intent (*Goodyear Tire etc. Co.* v. *Wells Fargo Bank, supra*), it is obvious that the character of the check cannot be determined on his nonexistent intent, and the controlling intent is that of the person who, within the scope of his authority, fixes the name of the payee. In this case that person was Ellis. It must be understood that our decision is based on the system, which was so set up by plaintiff as to eliminate from the duty of Hadley, as the actual signer of a check, any consideration of its propriety, and particularly to relieve him from any necessity of even looking at the payee's name. If he had any duty in these respects, but performed it negligently or perfunctorily or even omitted to perform it at all on some particular occasion, a different result might follow."

The judgment should be reversed.

Carter, J., concurred.

Appellant's petition for a rehearing was denied May 27, 1943. Shenk, J., and Carter, J., voted for a rehearing. Schauer, J., did not participate therein.