[Civ. No. 15372. Second Dist., Div. One. Apr. 1, 1947.]

RALPH EDGINGTON, Appellant, v. SECURITY-FIRST NATIONAL BANK OF LOS ANGELES, Respondent.

Steiner Larsen and Jean Wunderlich for Appellant.

Jennings & Belcher and Martin Gendel for Respondent.

DORAN, J.—This is an appeal from a judgment denying plaintiff the recovery of a deposit with the Security-First National Bank in the sum of $7,118.94, said amount having been paid out by the bank on a series of some 145 checks signed by the plaintiff and fraudulently cashed by plaintiff's employee Green, the latter having forged the endorsements of the named payees.

The record discloses that on April 24, 1942, the appellant Edgington employed one Thomas Green as "oil yield clerk" in appellant's refinery located at 200 E. Artesia Blvd. in Long Beach. Green is also referred to as a "payroll clerk" in appellant's brief, and as "office manager" in the trial court's findings. The appellant testified that Green "kept

track of the oil movements through the refinery and the disposition of the refined oil products to the various producers. He accumulated the time sheets of the employees; prepared from the time sheets, pay roll cards for each employee; prepared the check in the net amount due to the employe, and brought them in to me for my signature. . . . And then he sent the time cards, the check stubs and the invoices for miscellaneous purchases . . . down to Mr. Bakewell, a certified public accountant, who did the actual bookkeeping for the refinery.'' After the checks had been signed by Edgington, ''Mr. Green normally turned the bulk of these (weekly payroll) checks . . . over to Mr. Bass, who was the foreman, who distributed them to the employees. If they did not happen to be on duty at the time, Mr. Green kept them—and the employee picked them up the next day.'' At the end of the month the accumulation of paid checks was mailed by the bank to the refinery; Green took the cancelled checks and the accompanying bank statement, and in the course of time forwarded those documents to Mr. Bakewell, the accountant, Bakewell's office not being at the refinery. This was the normal procedure.

About June 26 or 27, 1944, while investigating an apparently excessive expenditure of petty cash in the office, Edgington for the first time discovered that, in reference to the 145 pay roll checks here involved, Green had forged the names of the payees and collected the amounts for which such checks had been drawn. According to the trial court's findings, ''Beginning early in 1942, shortly after he was employed by plaintiff, Green prepared various pay checks, naming as payees the employees or former employees of plaintiff. He also prepared fictitious time vouchers with forged signatures of employees for work that was not actually performed.'' After the checks were signed by Edgington, the *modus operandi* was that ''Green, pursuant to his plan to defraud, indorsed the names of the payees on the checks and took them either to Greywood's or to one of the Swenson's Public Markets where he negotiated them.'' Some of the checks were negotiated at branches of the Bank of America and the Security Bank, and to individuals. ''Upon negotiating the checks Green indorsed his own name in lead pencil.'' In due course, the Bank of America received certain of these checks, guaranteed prior indorsements, and presented such checks through the Clear-

ing House, which were ultimately paid by the Security Bank, respondent herein. The trial court also found that "Upon receiving the checks from the defendant Security Bank, Green erased, in some cases not completely, his own indorsements. He made a preliminary examination of the statements and then forwarded them to the plaintiff's auditor. Plaintiff did not make actual discovery of the fraud until early in June of 1944. At that time he went to the defendant Security Bank and found among the paid checks charged to his account that month a number bearing forged indorsements on which Green's signature appeared. Green thereupon confessed his forgeries and was prosecuted and convicted." From the statement in court of appellant's counsel it appears that "Mr. Green was a man who had a clear record before that time, and he served a little less than a year and I believe is now out on probation. He is here to testify today." However, Green did not testify at the trial and the only testimony in the record is that of the appellant Edgington.

The crucial issue herein is presented by appellant's contention that "The judgment is erroneous and should have been in favor of plaintiff, because (a) the instruments (checks) were order instruments and the forged indorsements passed no title to the bank, (b) plaintiff's conduct did not estop him to set up the forgeries and the proper interpretation of the evidence." It is, appellant asserts, "the intention of Edgington to the nature and existence of the payee which governs and not the intention of the payroll clerk Green"; this latter statement being made in reference to the interpretation of section 3090(3) which defines those instruments which are deemed "payable to bearer." This phase of the case therefore depends upon whether the checks in question are to be regarded as *payable to order*, in which event the bank paying same on forged indorsements of Green may be held liable. On the other hand, if the checks are to be deemed *payable to bearer* for the reason that they were drawn in favor of "fictitious" persons as specified in the Uniform Negotiable Instruments Act found in section 3090 of the Civil Code, then it becomes immaterial who cashed the checks or whether the indorsements were forged or genuine, in which case there would be no liability on the part of the paying bank.

Section 3090 of the Civil Code as it read prior to amendment in 1945, provides that:

"The instrument is payable to bearer—

(1) When it is expressed to be so payable; or

(2) When it is payable to a person named therein or bearers; or

(3) When it is payable to the order of a fictitious or non-existing person *and such fact was known to the person making it so payable.*" (Italics added.)

In this connection it is interesting to note, although not decisive of the present appeal, that subdivision (3) of the above section was amended in 1945, to read as follows: "When it is payable to the order of a fictitious or nonexisting *or living* person *not intended to have any interest in it* and such fact was known to the person making it so payable *or known to his employee or other agent who supplies the name of such payee.* (1945 amendments italicized.)

As against the appellant's assertion that the checks were "order" paper, and that it is "the frame of mind and intention of the person signing the checks (Edgington) that determines whether the payee named therein is fictitious or not, since he is the one 'making it so payable,' " within the meaning of section 3090(3) of the Civil Code; it is the contention of the respondent Security Bank that "The checks involved were bearer paper because the dishonest bookkeeper was the person making the checks so payable," within the meaning of the statute. Respondent also argues that "The checks involved are payable to bearer because the dishonest bookkeeper had the authority to circulate the checks by determining when and where the checks would be delivered." The lower court, as before indicated, took the position that the checks constituted "bearer" paper under the statutory definition; hence that appellant depositor was not entitled to recover as against the paying bank, the forged indorsements by Green being immaterial since, if the checks be deemed payable to "bearer," the bank would be safe in paying the same to any person regardless of indorsements.

The question here presented, is not a new one in this state. The cases of *Security-First National Bank* v. *Bank of America* (1943), 22 Cal.2d 154 [137 P.2d 452], and *Los Angeles Investment Co.* v. *Home Savings Bank,* 180 Cal. 601 [182 P. 293, 5 A.L.R. 1193], are cited in appellant's brief; likewise, the respondent's brief asserts that appellant's "entire position must rise or fall on the applicability of (these) two cases to the facts at issue." In the Security Bank case just cited,

at page 160, the court states a rule which must determine the present issue, as follows: "Ordinarily, therefore, the *signer* remains the person making the completed check payable to a fictitious payee regardless of whether another employee is responsible for seeing that it reaches the payee. . . . A contrary conclusion has been arrived at when an employee has discretion to decide when and whether checks shall be delivered. (See *Goodyear Tire & Rubber Co.* v. *Wells Fargo Bank,* 1 Cal.App.2d 694 [37 P.2d 483], and cases there cited.) The soundness of these decisions need not be considered, since the claim that Ellis had such authority is based only on conjecture. The evidence shows merely that the checks were returned to the accounting division to be forwarded to the payees." (Italics added.) The Goodyear Tire & Rubber Co. case is relied upon by respondent, but is entirely unlike the present situation, and involved the matter of multiple signers of corporation checks.

The facts in the case of *Security-First National Bank* v. *Bank of America,* 22 Cal.2d 154 [137 P.2d 452], were not materially different from those in the instant litigation. It appeared that one Hadley was employed by the bank to sign checks when presented with proper debit slips. Dee Ellis, Jr., who was head of the accounting division of the trust department and authorized to prepare debit slips and checks but not to sign the checks, fraudulently presented to Hadley for signature certain checks and appropriate debit slips, the checks being made payable to one Bobbitt, an actual person but one not intended to have any interest therein. Ellis fraudulently indorsed Bobbitt's name, and as in the present case, secured the funds. Said the court: "The fact that Bobbitt was an actual person does not prevent his name from being that of a fictitious payee if it is not intended that the person named on its face have any interest in it. (*Union Bank & Trust Co.* v. *Security-First Nat. Bank,* 8 Cal.2d 303 [65 P.2d 355].) Such a check, however, is not payable to bearer unless the fact that the payee is fictitious is known by 'the person making it so payable' (Civ. Code, § 3090)," which person, the court held, was Hadley who had signed the checks, and not Ellis who had prepared the paper. So likewise, in the present case, "the person making it so payable" was the appellant signer, and not Green who had fraudulently prepared and presented such checks. That this represents the general rule both here and elsewhere is vouched for in the

Security Bank opinion at page 159, in the following language: "Throughout the many years since the Negotiable Instruments Law was drafted, this interpretation has been adopted almost universally throughout the country."

A somewhat similar situation in *Los Angeles Investment Co.* v. *Home Savings Bank*, 180 Cal. 601 [182 P. 293, 5 A.L.R. 1193], resulted in a similar holding that fictitious payee checks are not to be deemed payable to bear unless the *signer* thereof is aware of the fraud. The case further holds that "The obligation of the bank is not merely to use reasonable care," but that its undertaking is absolute; hence that "it is wholly immaterial whether the bank was negligent or not in paying on the forged indorsements. . . . That is a risk which the bank and not the depositor assumes." So also, it is held that the intention of the fraudulent employee "that the checks be made payable to persons who were not to receive the paper," was not attributable to the company. "Emory, (the employee)," the court said, "did not execute the checks on behalf of the company. It is the intention of the officers who did that must be taken to be the intention of the company. The execution of the checks was one within the scope of their authority, not within that of Emory. As to these officers it is plain that they did not intend to execute checks to fictitious parties or to pay money to the person to whom Emory intended it should be paid, to wit, himself." Certainly, in the instant case, the appellant did not intend, when signing the checks, that Green should appropriate the money. The Los Angeles Investment Co. opinion also answers another of respondent's contentions when it says, at page 611, that "a depositor is not bound to examine the indorsements on returned checks. . . . 'When it (the bank) returns the checks to the depositor . . . the latter has the right to assume that the bank has ascertained the fact to be that the indorsement is genuine.'"

The respondent's brief admittedly does not indulge "in an extensive analysis of the opinions in both of these cases," but claims that "there are fundamental differences in the facts as found by the trial court in the instant case and . . . in the two aforementioned California cases." Respondent then seeks to distinguish the present situation by reason of the finding that Green had authority to "deliver" the checks, and as the brief asserts, "to circulate the checks by determining when and where the checks would be delivered." How-

ever, as mentioned in appellant's brief, the record discloses that, whatever title may be correctly applied to Green, this employee's authority in reference to the checks in question was extremely limited, and of no more than a clerical nature. In arriving at a correct solution of the present controversy, this fact is of considerable importance. As is said in appellant's brief, "In making up the checks he (Green) had to employ only a knowledge of arithmetic. His was not the duty to ascertain whether the time sheets signed by the individual employees were correct or incorrect. . . . Clearly that term (deliver) cannot be meant or understood in the legal sense as bestowing a choice or discretion upon Green as to whether he would deliver the completed checks or not but only in the mere mechanical sense of handing them over, . . . If a payee called for it, he had to give it up. . . . Nor could be refuse Bass (the foreman) those checks that were meant for employees on duty on pay day." Green kept, in the office safe, those checks which the foreman could not distribute, and later, as a purely clerical or mechanical act, handed over such checks to the employees when the latter called for them, or Green mailed the pay checks to the employees. The respondent's assertion that Edgington, the owner and the person authorized to give life to the checks by signing, was "nothing more than a rubber stamp," and that Edgington's "signing of the checks was purely clerical and not discretionary and that Mr. Green had the actual authority to make the checks payable," borders on the ridiculous, and is in no sense supported by the record. Moreover, such a theory is directly contrary to that expressed in the California cases hereinbefore discussed.

At the conclusion of the case in the superior court the trial judge delivered from the bench an oral opinion in which, as appellant observes, great stress was laid upon "the isolated phrase in the Security-First National Bank case (22 Cal.2d 154, 161) . . . that 'a contrary conclusion has been arrived at when an employee had *discretion* to decide when and whether checks shall be delivered.' " This oral opinion denominates the Security Bank case as a "throw-back to legal conditions as they existed some twenty years before," and comments that the dissenting opinion therein is more logical than the main opinion. In this connection it may be noted that the Security-First National Bank case was entirely consistent with precedent previously established in this state and else-

where, and obviously must be followed until the rule has been changed. So far as the present case is concerned, any finding that Green had authority or "discretion" to give or withhold delivery of checks signed by appellant, is without foundation in the record.

It is further asserted by respondent that "If there was any legal liability on the part of the respondent, . . . the conduct of the appellant would estop him from being entitled in equity or law to any judgment in his favor." The alleged estoppel is apparently based on the trial court's finding that, after being returned from the bank, "the checks were inspected either by Green or the auditor or by both. The erasures of the indorsements of Green on the checks were in most cases obvious without any inspection of indorsements." From this premise, apparently, the court found "that more than a year prior to the commencement of the action the plaintiff had actual notice of the erasures of indorsements on the checks sufficient to put an ordinarily prudent person upon inquiry . . . and that by reason of the facts hereinbefore found the plaintiff is estopped and precluded from setting up the forgeries."

As one of several answers refuting the defense of estoppel, it is correctly pointed out in appellant's brief that, "there is absolutely no allegation of an affirmative defense of estoppel on the part of the Security-First National Bank in the pleadings." It is a well-settled principle of pleading that estoppel is an affirmative defense which must be affirmatively averred; *Holzer* v. *Read,* 216 Cal. 119 [13 P.2d 697], and other cases holding that defendants cannot rely on an estoppel which has not been pleaded.

Nor does the evidence justify application of the estoppel doctrine even if such defense had been pleaded. For example, the record discloses nothing to show that the erasures of the Green endorsements were "obvious without any inspection of endorsements," as found by the trial court. The only testimony on this subject was that of Mr. Edgington the appellant, who merely stated that such erasures plainly appeared "If, as and when you knew what you were looking for," and that "with the benefit of a magnifying glass . . . and a strong light," it was possible to "still read the Green endorsements on the check." In other words, a careful inspection after appellant's suspicions had been otherwise aroused,

disclosed, under favorable conditions, the erasure of Green's pencil signatures. The evidence shows that, and only that.

When it is considered that the payees named in the checks were, for the most part, actual employees whose names were known to Edgington; that these checks passed through one or more banks and the clearing house without question; that Green's authority, as pointed out, was most limited; and that "a depositor is not bound to examine the indorsements on returned checks," (*Los Angeles Investment Co.* v. *Home Savings Bank*, 180 Cal. 601, 611 [182 P. 293, 5 A.L.R. 1193]), it is obvious that this is not a proper case for estoppel. Nor do any other unequivocal circumstances support the estoppel theory. As said in an early case, *Tewksbury* v. *O'Connell*, 21 Cal. 60, 71, "courts have no power to create estoppels where none have arisen from any act of the parties sought to be estopped." Other California cases have stated that unless clearly warranted, "Estoppels are not favored," (*Weinberg* v. *John A. Vaughan Corp.*, 137 Cal.App. 55 [29 P.2d 862]); and that the doctrine "is intended for the protection of a party and is not intended to be used for the purpose of permitting one to perpetuate a fraud upon another," (*Cohen* v. *Metropolitan Life Ins. Co.*, 32 Cal.App.2d 337, 350 [89 P.2d 732].) That this is the law cannot well be doubted. Moreover, since the obligation of the bank in reference to forged indorsements is an absolute one under the holdings in the California cases hereinbefore cited, an affirmance of respondent's position would open wide the door to unwarranted avoidance of the rule.

Contentions similar to respondent's assertion that "if the appellant had not been negligent the course of conduct of the dishonest employee (Green) would have been discovered within a few months," have doubtless been raised in every case of this kind. Such an argument is well answered here as it was in *Los Angeles Investment Co.* v. *Home Savings Bank*, 180 Cal. 601, 611 [182 P. 293, 5 A.L.R. 1193], hereinbefore mentioned, where the court said: "If trusting them in regard to demands for checks for disbursements regular upon their face is negligence, so it would be negligence to trust them in a hundred other ways in which it was within their power to defraud their employer. Business could not be conducted on any such basis." Having rejected the argument that such conduct was negligence, the opinion says: "Even if the company were guilty of negligence in signing

the checks upon the fraudulent demands of Emory, it is plain that such negligence did not contribute to or induce the acceptance by the bank of the forged endorsements.''

█ The appellant's contention that full recovery on all checks should be allowed, notwithstanding the fact that more than one year had elapsed since the return of certain of the cancelled checks, cannot be sustained. Section 340(3) of the Code of Civil Procedure requires that an action ''by a depositor against a bank for the payment of a forged or raised check, or a check that bears a forged or unauthorized indorsement,'' be brought within one year. Appellant seeks to interpret this as meaning within one year from discovery of the fraud. However, the statute does not so provide, and in *Union Tool Co.* v. *Farmers etc. National Bank*, 192 Cal. 40, 52 [218 P. 424, 28 A.L.R. 1417], the court said: ''It is our view that where as here the cancelled checks and a statement . . . are regularly furnished to the depositor, the statute begins to run from the time the alleged forged or raised check was delivered to the depositor as a voucher supporting the payment made by the bank.'' See, also, Brannan's Negotiable Instruments Law, (6th ed.) page 1191. It appears from the trial court's Finding No. 13 that appellant's causes of action in reference to checks totaling $2,952.63 are thus barred by the provisions of Code of Civil Procedure, section 340(3). As to such checks only, appellant is not entitled to judgment. In reference to the amounts represented by all other checks bearing fraudulent endorsements and covered by the complaint, for the reasons hereinbefore mentioned, plaintiff-appellant is entitled to recover judgment as against the Security-First National Bank of Los Angeles.

That part of the judgment denying plaintiff recovery is therefore reversed with directions to enter judgment in plaintiff's favor in accordance with this opinion; in other respects the judgment of the trial court is affirmed. The attempted appeal from the court's order holding that causes of action on certain checks were barred by the statute of limitations, is dismissed.

York, P. J., and White, J., concurred.

A petition for a rehearing was denied April 22, 1947, and respondent's petition for a hearing by the Supreme Court was denied May 29, 1947. Carter, J., Schauer, J., and Spence, J., voted for a hearing.