21 N.Y.2d 219 (1967)
Hartford Accident and Indemnity Company, Appellant,
v.
Walston & Co., Inc., Respondent.
Court of Appeals of the State of New York.
Argued September 25, 1967.
Decided December 28, 1967.
Joseph Kilbourn, Charles R. McNamee, Stewart Maurice and John L. Ryan for appellant.
David S. Konheim for respondent.
Judges BURKE, SCILEPPI and KEATING concur with Judge VAN VOORHIS; Judge BREITEL dissents and votes to affirm in a separate opinion in which Chief Judge FULD and Judge BERGAN concur.
*221 VAN VOORHIS, J.
The decision of this appeal depends upon what is the duty of a broker member of the New York Stock Exchange to the owner of stolen shares of stock when delivered for sale and transfer by the thief or one of his confederates. The duty of such a broker does not depend upon whether the owner of the shares has been negligent in safeguarding them or upon whether the thief was placed by the owner, acting in good faith, in a position which enabled him to steal the stock. The cause of action is conversion. The defendant, to whom these shares of stock were delivered for sale, and which sold them and paid the purchase price to a confederate of the thief, either converted this stock or it did not do so, but if there was a conversion it is not a defense that plaintiff's assignor (Bache & Co.) may have been negligent in handling them.
Negligence of an owner facilitating a common-law larceny of tangible personal property is no defense to an action for conversion of the stolen goods against the vendee of the thief, even though he has bought in good faith from the thief or from a receiver of the stolen property (Silsbury v. McCoon, 3 N.Y. 379, 383-384; Menzel v. List, 49 Misc 2d 300, 315). "An owner does not forfeit his ownership for failure to take good care" of intangible personal property "any more than he forfeits it for failure to take good care of his watch" (People's Trust Co. v. Smith, 215 N.Y. 488, 493). If the title of the thief or his receiver were voidable only, the vendee acquires good title if the transaction occurs before notice of avoidance is given (Stanton Motor Corp. v. Rosetti, 11 A D 2d 296; cf. Uniform Commercial Code, § 2-403, subd. [1]). Negotiable instruments and stock transfers are to some extent governed by statutes but, unless the title of a vendee thereof is expressly protected by some statute, the vendee is held for conversion of the negotiable paper or security growing out of "an act of wrongdoing in meddling with and selling the property of another" (Casey v. Kastel, 237 N.Y. 305, 312; Pierpoint v. Hoyt, 260 N.Y. 26). It is true that an action for conversion is based on the right to possession, but plaintiff claims to be entitled to possession of this stock on the ground that it was the owner (McCoy v. American Express Co., 253 N.Y. 477). Title is, therefore, in issue in this action.
The transactions in suit occurred in March, 1960. The former Negotiable Instruments Law and Stock Transfer Act (Personal *222 Property Law, former art. 6) were then in effect. The stock in controversy belonged to plaintiff's assignor. Defendant exercised dominion over what was, in actuality, Bache & Co.'s property by selling it and paying the proceeds to a person to whom it did not belong. The issue here presented is whether defendant was protected in doing so by the Negotiable Instruments Law or the Stock Transfer Act as a bona fide purchaser of the shares. A selling broker, which defendant was, is recognized as a "purchaser" under these statutes for these purposes (cf. Uniform Commercial Code, § 8-304, subd. [1], which, in this respect, is declaratory of the existing law).
A holder in due course of negotiable instruments acquires good title although the paper was stolen and transferred by the thief (Turnbull v. Bowyer, 40 N.Y. 456; Gruntal v. United States Fid. & Guar. Co., 254 N.Y. 468; cf. Uniform Commercial Code, § 8-301). A person would be a holder in due course of a negotiable instrument if he acquired it for value and without notice where it was payable to bearer (Negotiable Instruments Law, § 20; Uniform Commercial Code, § 3-104), and a negotiable instrument was treated as payable to bearer under the Negotiable Instruments Law in effect at the time of these transactions if it was payable to the order of a fictitious or nonexisting person, and such fact was known to the person making it so payable (Negotiable Instruments Law, § 28, subd. 3, amd. by L. 1960, ch. 726, and carried forward, as further amended, into Uniform Commercial Code, § 3-405). Although stock certificates have some of the qualities of negotiable instruments, they were not negotiable instruments under the definition of section 20 of the Negotiable Instruments Law which furnishes useful analogies, as, for example, in the case of a stock certificate indorsed by the registered owner in blank (Turnbull v. Longacre Bank, 249 N.Y. 159) to which a bona fide transferee has similar rights to the holder in due course of a bearer bond (Gruntal v. United States Fid. & Guar. Co., 254 N.Y. 468, supra). The decision of this appeal does not depend in every respect upon differences between the Negotiable Instruments Law and the Stock Transfer Act nor, it would appear, on differences between those statutes and the Uniform Commercial Code which also furnishes useful analogies without being controlling. We must look, however, to the Stock Transfer Act (former Personal Property Law, art. 6) to *223 find protection for a bona fide purchaser in defendant's position if defendant is to escape being governed by the common-law rule that a purchaser for value and in good faith of stolen personal property is legally responsible to the owner. The applicable sections of that article are 162, 166 and 168 which will be analyzed after a brief statement of the facts.
In this instance the certificates representing the stolen shares were registered in the name of Jack Arbetell. An unknown man purporting to bear that name opened a new account with defendant, delivered the certificates to defendant, and received from defendant $76,284.71, being the proceeds of sale. Rule 405 of the New York Stock Exchange, then and now in force, provides that "[A broker must] use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried".
The only effort made by defendant to "know its customer" in this instance, as was testified by its customer's man, was that a new customer calling himself Jack Arbetell introduced himself on the telephone by saying that he would like to open an account "to transact some business" which involved selling securities, and that he appeared at the office following this telephone conversation, and identified himself by showing "one or two cards" with the name Jack Arbetell on them. The best recollection of the witness was that one of the cards was a business card. He did not recall what the other one was. This was the only evidence of identification that was produced. The stock indorsements signed by the new customer were witnessed by employees of defendant who certified to his identity without knowing who he was except as he had thus identified himself.
The stock in suit, belonging to plaintiff's assignor, Bache & Co., had been surreptitiously transferred to the name of Arbetell by a faithless employee of Bache, who removed the certificates from Bache's mail when they were returned by the transfer agents. The certificates had been indorsed in blank when sold to Bache, and were supposed to have been forwarded by this employee to the transfer agents for transfer on the books of the corporations to Bache & Co. either for its own account or to be held for a customer or customers in Bache's name as a street name.
*224 The applicable provisions of statute, in effect at the time of these transactions, were, as above stated, sections 162, 166 and 168 of the Personal Property Law. Section 166 provided: "The delivery of a certificate to transfer title in accordance with the provisions of section one hundred and sixty-two is effectual, except as provided in section one hundred and sixty-eight, though made by one having no right of possession and having no authority from the owner of the certificate or from the person purporting to transfer the title."
Section 168 provides, insofar as material, that "If the indorsement or delivery of a certificate" was procured by fraud or duress or "If the delivery of a certificate was made * * * Without authority from the owner" the possession of the certificate may be reclaimed and the transfer rescinded unless "The certificate has been transferred to a purchaser for value in good faith without notice of any facts making the transfer wrongful".
As appears from the sentence quoted from section 166, the application of both of these sections is limited to the "delivery of a certificate to transfer title in accordance with the provisions of section one hundred and sixty-two".
The material portion of the latter section read:
"Title to a certificate and to the shares represented thereby can be transferred only,
"(a) By delivery of the certificate indorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby". (Italics supplied.)
Respondent asserts that what happened here is enough, in itself, to bring the indorsements within the Personal Property Law, as it then read, without regard to who actually owned the shares or whether there were or were not one or more Jack Arbetells in existence, and without reference to whatever knowledge of the circumstances was possessed by Bache & Co. or what effort was made by Walston & Co., Inc. to verify who it was that opened the account in the name of Jack Arbetell or who signed the certificates. We think that the requirements of "good faith" (§ 168) and that a certificate be indorsed "by the person appearing by the certificate to be the owner of the shares represented thereby" (§ 162, subd. [a]) impose greater duties upon the selling broker than merely to see that the certificate has been *225 signed by someone, no matter by whom, in the name of the person (existent or nonexistent) in whose name it is registered and without making serious effort to ascertain with whom the broker is dealing.
It is true that in the action which arose out of the same swindle which was decided by the United States District Court for the District of New Jersey there was direct evidence that the stock certificates were delivered to the selling broker by a person who was not Jack Arbetell. Here, however, the testimony of the employee of Bache who handled the operation inside the office and stole the certificates is to the effect that Bache & Co. had no customer by the name of Jack Arbetell, that he knew of no person bearing that name, that he had never been given the right to use the name and had no reason to believe that there was such a person in existence. After removing the certificates from Bache & Co.'s mail, he testified that he turned them over to a confederate named Yudelowitz. This was sufficient to create a strong inference that the stock certificates were neither delivered to defendant by any Jack Arbetell nor indorsed by such a person and that reasonable inquiry by defendant respecting the identity of its customer would have disclosed the facts.
Forgery of an indorsement of a stock certificate does not protect a transferee any more than it does in the case of a negotiable instrument. Even under subdivision 3 of section 28 of the former Negotiable Instruments Law (which never applied to stock transfers) it has been held that the indorsement of the name of a fictitious or nonexistent payee is forgery and does not protect the transferee of the paper unless the maker knew the payee to be fictitious (United Cigar Stores Co. v. American Raw Silk Co., 184 App. Div. 217, affd. 229 N.Y. 532). Bache & Co. had no knowledge that these shares had been issued in the name of Jack Arbetell, which was carefully concealed from it through falsification of books and otherwise by Norman Mais, the employee who stole the certificates. Bache & Co. is not chargeable with knowledge possessed by an employee while stealing its property or acting otherwise in hostility to its interests (Benedict v. Arnoux, 154 N.Y. 715; Otsego Aviation Serv. v. Glens Falls Ins. Co., 277 App. Div. 612, 618-620; New York Cent. Ins. Co. v. National Protection Ins. Co., 14 N.Y. 85; Utica Ins. Co. v. Toledo Ins. Co., 17 Barb. 132). The basis on which a principal is charged with *226 knowledge of its agent under such decisions as Constant v. University of Rochester (111 N.Y. 604) or Title Guar. & Trust Co. v. Pam (232 N.Y. 441, 453) is that it is presumed that the agent will normally communicate the information to his principal in the course of the performance of his duties (Corrigan v. Bobbs-Merrill Co., 228 N.Y. 58, 69). Such an inference certainly is not and should not be indulged in a situation where an employee is stealing from his employer. The employer would be the last person to whom the thief would normally communicate such information, a conclusion that is fortified in this instance by Mais' manipulation of Bache's records in a successful endeavor to keep Bache in ignorance of what he was doing.
The object of rule 405 of the New York Stock Exchange is described in Israels' commentary (McKinney's Cons. Laws of N. Y., Book 62½, pt. 3, pp. 221-222) to section 8-304 of the Uniform Commercial Code (the comment applies to the transactions in suit although the Uniform Commercial Code does not): "The jeopardy of the selling broker is broadened by the rules and practice of the organized markets which require that he `know his customer'." Even the Uniform Commercial Code, which apparently modifies the law in this State somewhat in favor of the selling broker by relaxing partially the rigor of the Casey v. Kastel (237 N.Y. 305, supra) rule, provides by section 8-318 that the test of good faith of a selling broker includes "observance of reasonable commercial standards if he is in the business of buying, selling or otherwise dealing with securities". It would seem that rule 405 of the New York Stock Exchange formulates what are "reasonable commercial standards" in this context by requiring the broker to use due diligence to learn the essential facts relative to its customers. The obligation of a broker selling securities to observe reasonable commercial standards was expressed by section 8-318 of the Uniform Commercial Code but was not created by it. The performance of these duties is an element of what constitutes good faith under section 168 of the Personal Property Law in effect at the time of these transactions. Selling brokers cannot shirk these duties and at the same time claim to have acted in good faith without being charged with knowledge of facts which compliance with reasonable commercial standards would have disclosed (Fidelity & Deposit Co. v. Queens County Trust Co., 226 N.Y. 225).
*227 Operating rules of a railroad company were held to have probative force in Danbois v. New York Cent. R. R. Co. (12 N Y 2d 234, 236-240) and a fortiori the same is true of rules of a stock exchange, of which Bache & Co. and defendant were both members (Franklin v. Dick, 262 App. Div. 299, 301-303, affd. 287 N.Y. 656). Nothing in former sections 162, 166 or 168 of the Personal Property Law makes the duty of a selling broker to know his customer null and void or inapplicable to the circumstances of this case.
It is argued for defendant-respondent that these stock certificates are to be regarded as having been indorsed in blank inasmuch as the former certificates representing the same shares were in that form when originally acquired by Bache & Co., that the issuance of the new certificates in the name of Jack Arbetell should be regarded as a nullity since it was unauthorized by Bache & Co. and that defendant, Walston & Co., Inc., should be deemed in law to occupy the same position in which it would have been if it had received the former certificates indorsed in blank as they were when delivered to Bache & Co. This reasoning overlooks that it was a purpose of these sections of the Personal Property Law, and still is of the corresponding provisions of the Uniform Commercial Code, to furnish some protection to the owner of stolen stock by requiring the selling broker to use due diligence to know his customer. It is the policy of the law, to be sure, to protect the selling broker where he comes into possession of a certificate indorsed by the true owner in blank, in which instance he has the right to assume (absent notice to the contrary) that the owner would take the same care of the security that he would of a bearer bond and be subjected to the same consequences in case of theft (Turnbull v. Longacre Bank, supra; Gruntal v. United States Fid. & Guar. Co., supra). Even in the sale of a bearer bond there is a duty to take some steps to know who the customer is. The Stock Exchange rules recognize that in the sale and transfer of investment securities a greater duty of inquiry is imposed than exists upon the discount of commercial paper (Manufacturers & Traders Trust Co. v. Sapowitch, 296 N.Y. 226; Hall v. Bank of Blasdell, 306 N.Y. 336). The selling broker is charged with a somewhat greater responsibility where he receives a stock certificate issued in a particular name. In such instance he is required to use due diligence to ascertain *228 the identity of the person with whom he is dealing and who signs the indorsement.
The dissenting opinion recognizes that the "imposter" rule does not apply to this case (Cohen v. Lincoln Sav. Bank, 275 N.Y. 399; Halsey v. Bank of New York, 270 N.Y. 134).
Since we differ with the trial court in certain material respects regarding what are the issues underlying a determination of whether defendant is liable, it is necessary that there be a new trial. The points of difference have been outlined in this opinion and are, specifically, as follows:
These stock certificates, when presented to defendant, were not indorsed in blank except as the indorsements printed on the back may have been signed in defendant's office by a person assuming to be Jack Arbetell. The evidence does not indicate whether the name of "Walston & Co., Inc." was stamped upon the blank form of the indorsement as assignee before or after it was signed in the name of Jack Arbetell. In either event under subdivision (a) of former section 162 of the Personal Property Law it was required that the certificates be indorsed by the person appearing by the certificate to be the owner of the shares represented thereby, viz., Jack Arbetell. A stock certificate is not delivered in accordance with the provisions of section 162, and the transfer is, therefore, not protected by sections 166 and 168, if the signature upon the indorsement is forged. This would be true whether or not Jack Arbetell was a fictitious person, inasmuch as subdivision 3 of section 28 of the former Negotiable Instruments Law did not apply to stock transfers (Mohr v. Penney Co., 242 App. Div. 385, 387-388, affd. 270 N.Y. 606) and, even if it did, it would not render the certificate payable to bearer even though Jack Arbetell were a fictitious person unless knowledge thereof were brought home to Bache & Co. which it was not (United Cigar Stores Co. v. American Raw Silk Co., 184 App. Div. 217, affd. 229 N.Y. 532, supra; Hall v. Bank of Blasdell, supra, p. 344). The stock certificates in the name of Jack Arbetell when delivered to defendant are not deemed payable to bearer for the reason that the former stock certificates representing the same shares were in that form when previously delivered to Bache & Co.
The question of title as affected by the Stock Transfer Act (Personal Property Law, former §§ 162, 166, 168) is at issue in *229 this case, as is acknowledged in defendant-respondent's brief and in the dissenting opinion.
In order to establish defendant's status as a bona fide purchaser for value it was necessary to show more than that "it made payment to Arbetell or somebody who called himself Arbetell." In order to establish "good faith" on the part of defendant as transferee of these shares of stock under former section 168 (subd. [d], par. 1) of the Personal Property Law, it was necessary for defendant to establish that in receiving and selling the shares for the account of a new customer calling himself Jack Arbetell it observed reasonable commercial standards, which included the exercise of due diligence to learn the essential facts relative to this customer, his account and these sales orders.
Questions of fact are presented by these principles of decision.
A new trial should be granted, in accordance with this opinion, with costs to appellant to abide the event.
BREITEL, J. (dissenting).
The issue is which of two regular stockbrokers should bear the loss resulting from the larcenous misappropriation from one of the brokers of corporate shares of stock. Plaintiff is the insurer and assignee of Bache & Co., whose transfer clerk, in conspiracy with a gang of accomplices, misappropriated the stock. Defendant is Walston & Co., the broker through whom the misappropriated shares were sold and translated into cash proceeds. Thus far defendant Walston has prevailed, a judgment dismissing the complaint after a trial having been affirmed unanimously by the Appellate Division.
The issue turns on whether Walston, as a purchaser for value of the misappropriated shares without notice, received good title through the certificates delivered to it by one of the accomplices and indorsed by him in a fictitious or assumed name. Because it is concluded that good title was passed through the certificates delivered to Walston by indorsements effective for that purpose, Walston should prevail and the order of the Appellate Division should be affirmed.
In March, 1960 one Norman Mais, a stock transfer clerk for Bache, was, in the course of his duties, given a number of stock certificates in three companies, General Fireproofing, New England Telephone and Telegraph, and Zale Jewelry Company. The certificates were indorsed in blank by their prior owners, and Mais was given instructions to have new certificates issued in *230 the name of Bache, as owner. Mais' duties in this instance, while involving no exercise of discretion, required that he and an assisting typist do the paper work necessary to transmit the old certificates to the respective transfer agents and instruct them on behalf of Bache to issue new certificates in the name of Bache as owner.
Mais, on the instructions of his accomplices, instead of doing as he was required to do by his employer, directed that the new certificates be issued in the name of "Jack Arbetell." The evidence does not establish whether this was an assumed name of a real person or a fictitious name. When the new certificates in the name of Jack Arbetell were returned to Bache, Mais, because he had manipulated the records of Bache before and after the return to conceal what he was doing, was able to pocket the new certificates and pass them on to his accomplices.
In April, 1960 a person who claimed to be Jack Arbetell, previously unknown to Walston, opened an account there, giving an address and a bank reference. He produced the certificates, indorsed them in the presence of Walston's employee, requested the sale of the stock, and in short order received and cashed checks payable to Jack Arbetell in the aggregate sum of $76,284.71. This was but a part of the misappropriations from Bache effected by the gang. Moreover, Bache had to replace the misappropriated shares at substantially higher prices.
In June, 1960 the misappropriations were discovered, investigations and criminal prosecutions ensued, and Mais was available as a compliant witness on the trial in this action. Plaintiff, as Bache's insurer, covered Bache's loss, took an assignment of the purported claim against Walston, and, both as subrogee and assignee, instituted this action on the claim.
There are two constructions or characterizations of the facts which, while offered as arguments to support diverse conclusions, actually predetermine the result. They, therefore, invalidly conclude the analysis instead of starting it. Thus plaintiff argues that the misappropriation of the shares was not effected until the new certificates were abstracted by Mais from the possession of Bache. Walston, on the other hand, argues that the misappropriation occurred when Mais diverted, and, therefore, converted, the old certificates, indorsed in blank (and, therefore, negotiable to bearer). If the "larceny" consisted of the certificates *231 indorsed in blank by the prior owners, then what ensued was sufficient to pass title to the shares, now become bearer certificates, to a purchaser for value without notice. On the other hand, it is argued that the taking of the new certificates with Arbetell as the ascribed owner was the "larceny," and that the indorsement by the accomplice was, it is also claimed, a forged indorsement, ineffective to pass "good title" to anyone.
On another tack, with the same result as if the misappropriation was that of bearer certificates but relying on a quite different theory, if the "Jack Arbetell" name was that of an assumed personality or fictitious nonperson, as Walston argues, then the accomplice could provide the certificates with an effective indorsement. On the other hand, if the name "Jack Arbetell" related to a real person or to a describable person with whom the transfer agents or Bache intended the ownership to rest, the indorsement, as plaintiff argues, by one not so intended (by whatever name) was not effective to confer good title to the certificates.
In applying these several characterizations both sides rely heavily on cases involving negotiable checks which are not always applicable, although the concept of negotiability, as applied both to negotiable instruments (checks, notes, bills of exchange) and to investment securities (stock, commodity receipts, bonds), is relevant.
The complex of facts  examined as it occurred in a practical, real-life transaction, without premature and question-begging application of legal categories  reveals a situation not quite like that which either side contends existed, but much closer to the view taken by Walston. In short, instead of fragmenting the events in this unified larceny scheme, it is necessary to view it, as the culprits did, as one integrated plan to misappropriate not just any certificates of stock but certificates they could exchange for cash. The scheme involved the two phases, namely, the unauthorized direction to the transfer agents to issue the new certificates in the name of Jack Arbetell, and the abstraction of the new certificates after their return to Bache. The larceny of the stock could not be accomplished except by this dual-phased manipulation of the underlying papers, because selling brokers would insist on bank or broker guarantees of the indorser's signature. Thus, when Mais diverted the bearer certificates he was *232 engaged in the first phase of his manipulation, which he could not have done unless the certificates were indorsed in blank. On the other hand, when the transfer agents returned the new certificates they were in a name useful to the gang, and to the gang alone, in exchanging the certificates for cash.
On this view of the facts, it is apparent that the purpose of the schemers was to put the new certificates in a name, whether assumed or fictitious is immaterial, for which they could supply the necessary identifications and references to induce another stockbroker to sell them. In accomplishing this, they used Mais, who had the limited authority to transmit instructions to the transfer agents. As such, Mais had the power to bind Bache, certainly with respect to any transactions with the transfer agents. This is evident if one considers that it would hardly lie in the mouth of Bache to sue the transfer agents for improper inscriptions of the owner of the new certificates, because Mais acted "without authority." In this context Mais was in no different situation than an employee who is authorized to sign checks on behalf of his employer but who, in violation of the authority and confidence reposed in him, signs checks in favor of a payee with an assumed or fictitious name in order to embezzle (see, e.g., Phillips v. Mercantile Nat. Bank, 140 N.Y. 556).
The impostor theory, raised in this case and superficially attractive, does not apply and, of course, its exceptions do not apply either, although there are striking similarities. The simplest statement of the impostor theory was expressed by Judge LEHMAN in Cohen v. Lincoln Sav. Bank (275 N.Y. 399, 404). He there said: "Where a person has been induced by fraud to draw a check to the order of an existing person, whose name and identity has been fraudulently assumed by another, and to deliver the check to the impostor, it has been held by most courts that an indorsement by the impostor is not a forgery and the bank upon which it is drawn may pay it upon such indorsement."
True, as argued by plaintiff, there was no antecedent fraud addressed to Bache (although there was to the transfer agents) and there is no evidence that an accomplice was deceiving Bache or its employee that he was a real Jack Arbetell. It should be noted, however, that the impostor theory could still supply a useful analogy, if it were necessary, but it is not. The fictitious payee doctrine fits the facts here more closely, once the larcenous *233 scheme is viewed as a whole instead of being atomized into its separate events.
On this view the appropriate analogy is that involving the execution of a negotiable instrument in favor of a fictitious payee. The doctrine has been applied to instruments specially and intentionally indorsed over to fictitious indorsees (Hall v. Bank of Blasdell, 306 N.Y. 336, 344). In such case, the instrument is treated as if it were a bearer instrument and any indorsement, or none at all for that matter, suffices to pass "title" (former Negotiable Instruments Law, § 28, subd. 3; cf. Uniform Commercial Code, § 3-405, subd. [1], pars. [b], [c]). In order, however, for the facts in this case to permit the application of that theory it is necessary to conclude that someone in the Bache enterprise, at least with limited authority, intended to and in fact did procure the issuance of the stock certificates in an assumed or fictitious name. And this is exactly what happened.
That the foregoing describes the situation accurately is further borne out when one views the resulting new certificates from the point of view of any third party such as Walston. Thus, to it, there were presented evidently authenticated and validly issued certificates, and in fact indorsed by someone using either an assumed or a fictitious name. Of course, it was the antecedent fraud of an employee of the Bache enterprise, with limited authority, which required the transfer agents representing the issuing corporations to issue the new certificates in that name. Mais was the last employee of Bache to handle the certificates prior to their transmission. Consequently, it may well be said that Mais was the person who made the certificates payable to Jack Arbetell (former Negotiable Instruments Law, § 28, subd. 3).
Mais, by transmitting the instructions to issue the new certificates in the name of Jack Arbetell, performed a role equivalent to that of one who makes or indorses a negotiable instrument so that it is payable to a fictitious payee or indorsee. He knew and intended that the new certificates were to be issud in an assumed or fictitious name  it makes no difference which. And he had that much authority, namely to transmit instructions, albeit he abused his authority as every embezzler does.
There is no New York precedent precisely applicable. The closest, Seaboard Nat. Bank v. Bank of America (193 N.Y. 26), *234 would seem to suggest a contrary rule. But that case involved a designation as payee of a real person with whom the drawer had had dealings. The faithless company employee did not intend, however, that the designated payee should take any interest in the instrument. There, the company employee presented to the Federal National Bank a check purportedly drawn by the company to the order of "N. Y. Draft". In return he received a draft drawn by Federal National upon another bank to the order of "Carroll Bros.," an enterprise with which the company in fact had had dealings. (N. B. The negotiable draft is that of the Federal National Bank and not that of the company. Thus, on any view, the "intent" of the bank was more important than the "intent" of the employer company, the usual problem in the check diversion case.) The employee, but not the cashier of the Federal National Bank, intended that the designated payee, "Carroll Bros." have no interest. The court held that the instrument was not payable to bearer, for it did not appear that "the Federal National Bank knew Carroll Bros. was a fictitious or non-existing person, or intended that the instrument be payable to bearer" (supra, p. 36).
Notably, in the present case there is no evidence that Jack Arbetell was a real person, and, concededly, Bache had had no dealings with anyone by that name. In the Seaboard case the court stressed the fact that the designated payee was a real person, and noted that the payee had had dealings with the company. Moreover, the opinion in that case does not even make it clear whether the faithless employee was authorized to execute checks but simply refers to the fact that he fraudulently obtained the check in the form in which it was presented.
In any event, what is interesting about the Seaboard case is that the court's attention was directed primarily to whether the Federal National Bank (actually the drawer of the bank draft or cashier's check, a difference noted before) was aware of the fact that a fictitious person (or an assumed name) was involved as the designated payee. For many years, the Negotiable Instruments Law required that the relevant knowledge that an instrument was payable to a fictitious person be on the part of the "person making [the instrument payable to a fictitious person] so payable." More recently in many jurisdictions, and *235 in New York in 1960, one month after the transactions between Mais and the transfer agents, the Negotiable Instruments Law was amended to make determinative the knowledge of the particular person who makes an instrument payable to a fictitious person or "his employee or other agent who supplied the name of such payee" (L. 1960, ch. 726, eff. April 21, 1960). This change was thereafter included in the Uniform Commercial Code (§ 3-405). The applicable Official Comment states: "4. * * * The principle followed is that the loss should fall upon the employer as a risk of his business enterprise rather than upon the subsequent holder or drawee. The reasons are that the employer is normally in a better position to prevent such forgeries by reasonable care in the selection or supervision of his employees, or, if he is not, is at least in a better position to cover the loss by fidelity insurance; and that the cost of such insurance is properly an expense of his business rather than of the business of the holder or drawee."
In this state of the law the Seaboard Bank case is hardly controlling. The recently expressed legislative policy in the Uniform Commercial Code, and in the specific amendment to the Negotiable Instruments Law which took effect but a month after the transactions in suit, requires an uninhibited approach in this case. And this analysis of policy with respect to negotiable instruments assumes what is not true, namely, that negotiable instruments law determines the rules for negotiable stock certificates, rather than only providing close analogies.
The reasoning in the Supreme Court of California in Union Bank & Trust Co. v. Security-First Nat. Bank (8 Cal. 2d 303) is particularly helpful. In the Union Bank case, an officer and director, empowered to draw checks on behalf of two corporations, prepared and signed checks to the order of the Union Bank. With these checks and a written requisition signed by him on behalf of his corporations, he procured cashier's checks from the Union Bank drawn to the order of payees designated by the officer. The officer intended that the designated payees have no interest in the checks, but the bank which issued them was, of course, not aware of this intent. The court nevertheless held that the checks were bearer paper. The court reasoned: "`while it is true that the maker of the cashier's checks in question was *236 the appellant, Union Bank, still it was the faithless employee's, Williams', intent that must govern, because the bank made the cashier's checks payable to the parties designated by Williams. The appellant's intent was to make the cashier's checks payable to the parties that Williams intended them to be payable to. Williams, therefore, was the real drawer and "the person making it so payable" as to each cashier's check'" (supra, p. 308). Since the officer (employee) acted within the scope of his authority in procuring the cashier's checks, the corporations were held bound by his acts (id., p. 309). It is interesting to observe that the designated payees were known to the officer and there is no indication whether they were known to the corporations. (See semble accord Goodyear Tire & Rubber Co. v. Wells Fargo Bank, 1 Cal. App. 2d 694; Rancho San Carlos v. Bank of Italy, 123 Cal. App. 291; see, also, Taylor v. Security-First Nat. Bank, 99 Cal. App. 2d 569; Hackensack Trust Co. v. Hudson Trust Co., 119 Misc. 689, affd. 207 App. Div. 897; but cf. Security-First Nat. Bank v. Bank of America Nat. Trust & Sav. Assn., 22 Cal. 2d 154.)
Finally, in utilizing the doctrines and rules applicable to negotiable instruments as exemplified both by the applicable statutes and decisions it must be kept in mind that, at best, they provide analogous doctrines and not direct holdings binding as precedents. On the other hand, however, the policy of furthering negotiability for negotiable instruments and negotiable stock certificates is similar, if not identical, for each class of instrument.
One additional comment is merited before turning to the statutes directly applicable to stock certificates. Plaintiff stresses that negligence of either Bache or Walston is not a material factor and that no duty was owned to Walston. It is wrong to use an ill-disguised negligence test and to look to which party was most at fault in creating the particular situation. Plaintiff is quite correct in making that argument. It should not be material whether Bache had sufficient internal controls to prevent malfeasance such as Mais', or, for that matter, whether Walston had sufficient controls to prevent sales on behalf of one such as claimed to be the Jack Arbetell of the stock certificates. For reasons of commercial convenience and to *237 maintain the stability of transfers, the tests should turn on the furtherance of commercial negotiability and the situs of title. Lack of good faith in a purchaser for value would, of course, be an exception, but no issue is raised by the parties in this case as to Walston's good faith.
The applicable statute, as of that time in 1960, is section 162 of the Personal Property Law (since repealed and now covered by the Uniform Commercial Code). It provided:
"Title to a certificate and to the shares represented thereby can be transferred only,
"(a) By delivery of the certificate indorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby, or". The operative language is "a specified person by the person appearing by the certificate to be the owner". The reference to certificates indorsed in blank is immaterial. Walston did not receive such certificates. But, on the view of the facts taken above, and applying the fictitious payee doctrine, the Jack Arbetell who opened the account at Walston was the person appearing by the fully authenticated certificates to be the owner of the shares represented by the certificates, and it was so intended by the issuing corporations (even assuming their intention was material) on the manipulated instructions of Bache's employee, Mais, to the transfer agents.
Section 162 is implemented by section 166 of the same statute which read as follows: "The delivery of a certificate to transfer title in accordance with the provisions of section one hundred and sixty-two is effectual, except as provided in section one hundred and sixty-eight, though made by one having no right of possession and having no authority from the owner of the certificate or from the person purporting to transfer the title." This, of course, carries out the policy of negotiability with respect to these commercial instruments, a policy highly favored in the law and by our economy (cf. former Negotiable Instruments Law, § 97). Thus it is of no moment, as the statute provides, that the delivery, if it satisfies section 162, was made by one having no right of possession and having no authority from the owner. In this way, negotiability of commercial instruments  authentically issued and valid on their face  is facilitated. *238 That such facilitation increases the risks of loss is tolerable so long as the loss is more than offset by the gains of facilitation.
Plaintiff refers to a case which arose out of the same conspiracy as this one, Hartford Acc. & Ind. Co. v. Great Eastern Securities Corp. in the United States District Court for the District of New Jersey. It has no application here because in the Great Eastern case there was no question but that the stock certificates were delivered to the selling broker by one who was not and did not purport to be Jack Arbetell, who was not known to the broker, and, therefore, whose signature was also not known to him.
Lastly, it should be noted that plaintiff's position proves its futility when it argues that the new Jack Arbetell certificates were owned by Bache, and that "No writing was made on the certificates by any person to whom the certificates were originally issued. Only Bache & Co. or its nominee could have made such a writing." This is not an argument addressed to the real world. Even Bache could not indorse certificates made out to Jack Arbetell. Of course, if Bache still retained possession of the certificates it could surrender them for re-registration.
From a pragmatic point of view, the allocation of fault in this case, or this kind of case, is not helpful. The fact is that brokers and their insurance carriers are as careful or as careless as the balancing of profit from speedy transactions against the cost of careful but slowing procedures requires, and the slack is taken up by the fluctuations in the insurance expense. Moreover, the end of greater rather than less negotiability is furthered by protecting one situated as Walston. In any event, it would take more than Solomonic wisdom to decide which of Bache or Walston should have avoided the instant losses. Either could have, quite easily.
Accordingly, I dissent and vote to affirm.
Order reversed and a new trial granted, with costs to abide the event. (For reargument: see 22 N Y 2d 672.)